**Mark LISS, as Chairman of the Trustees of the 966 Health Plan and the 966 Pension Plan, and Miguel Millet, Plaintiffs,**

v.

**Steven SMITH, Joseph Pasqualone, Frank Flores, Lawrence Finley, Edwin Gonzalez, Stephen Zaccherio, Vincent Sombrotto, and Bryan McCarthy, personally and in their capacities as plan fiduciaries, Defendants.**

No. 95 CIV. 1256(HB).

United States District Court, S.D. New York.

Jan. 13, 1998.

---

Richard A. Levy, Daniel Engelstein, Judy Paddow, Levy, Ratner & Behroozi, New York, NY, for Plaintiffs.

Peter Contini, Joy Schneider, L'Abbate, Balkan, Colavita, & Contini, LLP, Garden City, NY, for Defendant Bryan McCarthy.

Patrick M. Campbell, Granik, Silverman, Campbell & Hekker, New City, NY, for Defendant Trustees.

Stephen F. O'Beirne, Richards & O'Neil, LLP, New York, NY, for Defendant Vincent Sombrotto.

### OPINION AND ORDER

BAER, District Judge.

## TABLE OF CONTENTS

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285
 I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 285
 II. Local 966 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286
 III. The Amended Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286
 IV. The Motions and the Settlement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 288

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289

 I. The Trustee Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289
 A. Failure to Collect Delinquent Contributions . . . . . . . . . . . . . . . . . . 289
 B. Travelers Insurance Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 291
 1. Breach of Fiduciary Duty: ERISA Section 404 . . . . . . . . . . . . . . 291
 2. Prohibited Transactions: ERISA Section 406 . . . . . . . . . . . . . . . 292
 C. Fiduciary Breaches: Investments . . . . . . . . . . . . . . . . . . . . . . . . . . 294
 1. Loss . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 295
 2. Investment Policy and Guidelines . . . . . . . . . . . . . . . . . . . . . . . 295
 3. Investment Advisers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296
 4. Investigation of Fund Investments . . . . . . . . . . . . . . . . . . . . . . . 297
 5. Monitoring the Pension Fund's Solvency . . . . . . . . . . . . . . . . . . 299
 D. Selecting Service Providers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 300
 E. Diversification of Fund assets . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 301

 II. Bryan McCarthy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302
 A. Fiduciary Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 302

 B. Non–fiduciary Liability ............................................... 304
 1. Fiduciary Breaches ............................................... 304
 2. Prohibited Transactions .......................................... 306
 a. Travelers Arrangement........................................ 307
 b. Delinquent Contributions .................................... 308
 C. Malpractice ...................................................... 308

III. Vincent Sombrotto ..................................................... 309

IV. Equitable Relief ....................................................... 312
 A. General Standards .................................................. 312
 B. Current Employer Trustees: Smith and Pasqualone ................... 313
 C. Bryan McCarthy .................................................... 313

CONCLUSION ................................................................ 313

Plaintiffs move for summary judgment against all non-settling defendants on the first through seventh, ninth and eleventh causes of action in the Amended Complaint. Defendants have cross-moved for summary judgment on all eleven causes of action.[1] For the reasons discussed below, plaintiffs' motion is GRANTED in part and DENIED in part. Defendants' motions are DENIED.

## BACKGROUND

### I. Introduction

This case involves the administration of Teamster Local 966's Health and Pension Funds. Plaintiffs are Chairman of the Boards of Trustees of the Local 966 Health and Pension Funds (the "Funds" or the "Plans") and a plan participant. They bring this action under the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. §§ 1001 et seq. ("ERISA") against current and former Employer Trustees of both Plans;[2] two former Union Trustees;[3] the Local's past President, Vincent Sombrotto; and the Funds' former counsel and current counsel to the Employer Trustees, Bryan McCarthy.[4] The Amended Complaint asserts breaches of fiduciary duty by the defendants in violation of ERISA Section

404, 29 U.S.C. § 1104, as well as prohibited transactions in violation of ERISA Section 406, 29 U.S.C. § 1106. It seeks to assert liability for these breaches against defendants Sombrotto and McCarthy as well, alleging that while neither is a trustee, they are nonetheless liable as fiduciaries pursuant to 29 U.S.C. § 1002(21)(A). Plaintiffs also assert a pendent state-law legal malpractice claim against defendant McCarthy. The Amended Complaint seeks money damages as well as equitable relief, which, if granted, would remove the current Employer Trustees from their positions and remove Bryan McCarthy as counsel to the Employer Trustees pursuant to ERISA Section 502(a). 29 U.S.C. § 1132(a).

In essence, plaintiffs' allegations paint a picture of gross mismanagement, if not worse. Plaintiffs assert—and to a considerable extent have established—that the defendants abdicated their responsibility to act prudently and in the best interests of the Funds' participants.[5] Moreover, this failure appears to have benefitted the friends, colleagues and family of defendant Bryan McCarthy. To all those who thought that Senator McClellan, Robert Kennedy and

---

**1.** Defendants have styled their motions as motions to dismiss and/or for summary judgment. Because the Court has considered matters outside the pleadings, defendants' motions are treated as motions for summary judgment.

**2.** The present Employer Trustees are Steven Smith and Joseph Pasqualone. The former Employer Trustees are Frank Flores and Lawrence Finley.

**3.** The two former Union Trustees are Edwin Gonzalez and Stephen Zaccherio.

**4.** McCarthy was counsel to the Funds until the Local was placed in receivership and new Union Trustees were appointed, at which time he was retained as counsel to the Employer Trustees.

**5.** The Local 966 Health Fund has approximately 1,900 participants and the Local 966 Pension Fund has approximately 3,500 participants (including active employees, retirees, and "deferred vested" former employees who have not yet retired). Local 966 currently has approximately 1,800 members.

their colleagues fashioned legislation that would herald the end to such activity, the papers on this motion are a stark reminder that the success of their efforts requires eternal vigilance.

## II. Local 966

The Funds are affiliated with Local 966 of the International Brotherhood of Teamster ("IBT"). As a result of a lawsuit alleging corruption in the IBT and a consent agreement entered into between the IBT and the United States government, an Independent Review Board ("IRB") was created to help root out corruption in the Union. After conducting an investigation into Local 966, the IRB alleged that (i) "the financial condition of Local 966 [was] deteriorating and that membership [was] declining," (ii) "Local Union 966 officers [had] engaged in dual unionism by organizing several non-IBT locals," and (iii) "Local 966 officers [had] engaged in financial malpractice including embezzlement of Local Union Funds." Notice of Trusteeship, Pl.Ex. B; see also Memo from IRB to Ron Carey, April 12, 1994, Pl.Ex. A. In light of these allegations, the IRB recommended that Local 966 be placed in Trusteeship. Memo from IRB to Ron Carey, April 12, 1994, Pl.Ex. A. IBT General President Ron Carey placed Local 966 into temporary trusteeship effective April 27, 1994 and appointed Gene Moriarty to serve as Trustee. See Notice of Trusteeship, Pl.Ex. B. At that time, defendant Sombrotto was removed from office as the Local's president. The new Local Trustee, Gene Moriarty, appointed himself and another individual as the Funds' Union Trustees to replace defendants Zaccherio and Gonzalez. Moriarty, who brought this action on behalf of the Funds, has since been succeeded by plaintiff Mark Liss.

## III. The Amended Complaint

The Amended Complaint asserts eleven causes of action. First, plaintiffs allege that defendants failed to adequately go about the collection of delinquent contributions or the interest due on such delinquent contributions and specifically implicates defendant Bryan McCarthy in this practice. In essence, plaintiffs allege that the defendant trustees—with McCarthy as their counsel, colleague and collaborator—had a practice of regularly waiving interest on delinquent contributions from employers as long as the payments were ultimately made before suit was filed. This practice amounted to interest regularly being waived on contributions three or more months late, without any investigation by the trustees or McCarthy as to whether such interest was in fact collectible and without any apparent consideration of the availability of attorney's fees and liquidated damages as additional remedies in suits to collect delinquent contributions, see 29 U.S.C. §§ 1132(g), 1145. Moreover, and more troubling, some of these delinquent employers were represented by, and had business dealings with, Bryan McCarthy's brothers through the brothers' various consulting and other businesses. Plaintiffs allege this practice violates ERISA Sections 406(a)(1) & 406(b)(2), 29 U.S.C. §§ 1106(a)(1) & 1106(b)(2), which prohibit the extension of credit to parties-in-interest. Plaintiffs also assert that such conduct is violative of defendants' fiduciary duty. See ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

Second, plaintiffs assert that defendants engaged in prohibited transactions and breached their fiduciary duty, again in violation of ERISA Sections 404 and 406, by allowing the Health Fund to enter into a certain arrangement with the Travelers Insurance Company ("Travelers"). The Travelers allegations implicate defendants McCarthy and Sombrotto in even more conflicts of interest involving additional union locals.

Defendant Sombrotto (who was Local 966's president, but not a trustee of the Funds) entered into an agreement with Travelers whereby Travelers agreed to provide health insurance for 2,000 members of the 966 Health Fund at a fixed premium per person or family.[6] The agreement depended on

---

6. Apparently, although Local 966 never signed off on the understanding reached with Travelers, the insurance company nevertheless provided coverage. That a major corporation of Travelers' size and stature would find itself embroiled in the machinations of the defendants is surprising.

minimum enrollment figures and set target dates by which those enrollment figures were to be met. Few if any Local 966 members ever enrolled in the Travelers Plan, and indeed it is hard to tell if they were ever even solicited. Rather, without Travelers' knowledge or approval, defendants enrolled members of two other union locals in the health plan. The two other locals were Local 912 of the United Commercial and Industrial Workers Union ("Local 912") and Local 1019 of the National Organization for Workers of America ("Local 1019"), neither of which is affiliated with a national labor organization (collectively, the "unaffiliated Locals"). It is the solicitation and sale of health insurance through these unaffiliated locals that forms the central core of this claim.

Locals 912 and 1019 were organized by defendant McCarthy and others, apparently for the sole purpose of selling the Travelers insurance at a profit. The arrangement worked as follows. Small businesses were solicited—primarily if not solely for the purpose of providing their employees with health insurance—by two employer organizations, the Association for Organized Services, Inc. ("AOS") and National Plan Administrators, Ltd. ("NPA"). The businesses would join one of these employer organizations. AOS or NPA in turn would each enter into a purported "collective bargaining agreement," on behalf of itself and its member companies, with one of the unaffiliated Locals. *See, e.g.,* Pl. Exh. V.[7] These agreements recognized the Local in question (912 or 1019) as the collective bargaining agent for all full-time employees of each member company,[8] set forth certain basic working terms and conditions and provided health care coverage for member businesses' employees. Apparently, the agreements were dependent on the provision of health care coverage to member businesses' employees and concomitantly a profit to the McCarthy family. Indeed, the agreements were terminable for failure to pay the health care premium. *See, e.g.,* Pl. Exh. V,

Art. XII, § 3. AOS was organized by Peter Zappasodi, a service provider to the Local 966 Health Fund who was also making periodic payments to Bryan McCarthy's brothers. McCarthy's conflicts of interest expand further with the revelation that McCarthy himself was counsel to Locals 912 and 1019 and in fact drafted the letters that sought their participation in the 966 Health Fund.[9]

The employer-members of AOS and NPA paid AOS and NPA up to double the premium cost that Travelers was charging Local 966. AOS (the organization through which kickbacks were funneled to the McCarthy family) and NPA kept most of this excess, with the unaffiliated locals, 912 and 1019, keeping the rest. The remainder—the "net premiums" charged by Travelers—was passed on to Travelers via Local 966.

These excess charges are the gist of this claim, as plaintiffs allege the skimmed profits rightfully belong to the Health Fund. More specifically, plaintiffs allege the money is a "plan asset" of Local 966's Health Fund under ERISA Section 406(a). They allege further that this "plan asset" went into the pockets of certain parties-in-interest: AOS and Defendant McCarthy, who received payments of $500 per month for the services he performed as counsel to Locals 912 and 1019. Thus, they claim the arrangement violated ERISA's prohibited transaction provisions, which forbid certain transactions involving plan assets and parties in interest. 29 U.S.C. § 1106.

Travelers ultimately cancelled the program in November 1993, after less than a year, because of a failure to meet the minimum enrollment requirements and because non–966 participants were enrolled. *See* Pl. Exh. OO. As can be expected, the enrollment of non–966 participants changed the applicable premiums on the policy (which were calculated to cover 966 participants). Travelers has sought reimbursement of some $600,000 from

---

7. AOS entered into agreements with Local 1019 and NPA entered into agreements with Local 912. For simplicity's sake, I refer jointly to both employer organizations and both locals, although each employer organization apparently only had dealings with one of the unaffiliated Locals.

8. It is unclear from the record before the Court whether the employees of these businesses ever voted to have Local 912 or 1019 represent their interests.

9. Sombrotto's brother Stephen was the President and organizer of Local 912.

the Health Fund as a result of the recalculated premiums. Peculiarly, Travelers has not instituted suit to collect the alleged deficiency.

. Plaintiffs' third through seventh, and ninth, causes of action allege breaches of fiduciary duty for the following acts (or omissions) of the defendants relating to Fund assets: failure to implement an investment policy and guidelines (III); failure to diversify Fund assets (IV); failure to retain investment advisers for the management of Fund assets (V); failure to properly investigate Fund investments (VI); failure to monitor the Pension Fund's solvency (VII); and failure to exercise due diligence in selecting service providers for the Funds (IX).[10] As discussed in greater detail below, these allegations relate to the trustees' complete and total failure to take even the most minimal and basic steps to ensure that Fund assets were invested and spent properly. The list of omissions is a prototype for breached fiduciary duty: the trustees failed to investigate the risks and propriety of investments, and instead accepted their broker's recommendations blindly; they failed to question or learn the extent of the commissions this same broker was charging them; they never compared such charges to the charges of other brokers or investment advisers; they never adopted an investment policy or guidelines; they never hired a professional money manager; they never considered their statutory duty to diversify investments; they failed to take any action for years in light of evidence of the Pension Fund's growing insolvency; and they failed to conduct any investigation into the Health Fund's service providers, most of whom were making regular payments to the McCarthy family. All the while, they were represented by McCarthy, who apparently failed to advise the trustees as to their duty to do any of the above or of any of his numerous conflicts of interest. Defendant Sombrotto, who attended virtually all of the Funds' meetings, and who as Local President had the power to appoint and remove the Union Trustees and the concomitant duty to monitor their performance, never took any action either.

Plaintiffs' eleventh cause of action asserts a state-law legal malpractice claim against defendant McCarthy for, inter alia, his failure to advise the trustees as to their obligations to perform the acts described above.

Finally, plaintiffs' eighth cause of action alleges that defendants breached their fiduciary duties by taking actions allegedly intended to ensure their continued control of the Funds in the face of the impending IRB/IBT Trusteeship. Plaintiffs' tenth cause of action asserts a breach of fiduciary duty by defendants for allowing defendant Smith to be appointed as an Employer Trustee, even though his status as a Union member rendered him disqualified from so serving. Plaintiffs have not moved for summary judgment on these claims. Defendants have moved for summary judgment on these claims.

## IV. The Motions and the Settlement

Plaintiffs have moved for summary judgment on liability on counts one through seven, nine and eleven of the Amended Complaint and ask the Court to exercise its power to remove the current Employer Trustees and McCarthy from their positions. All of the defendants have moved for summary judgment dismissing the Amended Complaint. Oral argument on the motions was held on July 22, 1997.

Since that time, the four former trustee defendants and the plaintiffs have settled all the claims asserted against the former trustees. The current Employer Trustees, Stephen Smith and Joseph Pasqualone, who have equitable as well as legal claims pending against them, have not agreed to a settlement. The settlement by its terms, however, dismisses all claims for money damages against the current Employer Trustees. The settlement is subject to notification to the Plan Participants and Court approval. For purposes of deciding the motions, however, the Court deems all claims against the former trustees dismissed and all but the equitable claims against the current Employer Trustees dismissed.

The remaining claims are the equitable claims against the current Employer Trust-

10. Plaintiffs incorrectly label this count eight in their Notice of Motion.

ees, and all claims against defendants McCarthy and Sombrotto. The relief sought on these remaining claims includes: (i) removal of the current Employer Trustees based on their participation in the trustees' breaches; (ii) finding McCarthy liable both for his role in the trustees' breaches and for malpractice and his removal as counsel to the Employer Trustees; and (iii) finding Sombrotto liable as a fiduciary for the trustees' breaches. As all of these claims are dependant on the conduct of the defendant trustees,[11] the Court will address plaintiffs' claims against all the trustees, notwithstanding the settlement.[12]

## DISCUSSION

### I. The Trustee Defendants [13]

Ten of the causes of action are brought against the Trustee defendants. As noted above, the former trustee defendants have settled all claims against them. In exchange for this settlement, the plaintiffs have also

---

11. The only exception is the legal malpractice claim against McCarthy.

12. Plaintiffs' eighth and tenth causes of action are also pending. Plaintiffs have not moved for summary judgment on these claims. Defendants' motions to dismiss these claims are DENIED. The Court believes these claims may be moot in light of the holding below removing the current Employer Trustees from office.

13. The Court notes that plaintiffs have submitted voluminous documentary evidence in support of their motion for partial summary judgment, including three volumes of deposition transcripts, two volumes of exhibits, and one volume of Pension and Health Fund minutes. They have also provided the Court with a Local Rule 56.1 Statement citing to the appropriate portion of the record. Defendant trustees, on the other hand, have provided almost no evidentiary support for their contentions. Although they deny many of plaintiffs' statements of undisputed facts, they provide no cites to the record in support of these denials. Such unsubstantiated denials are insufficient to raise a genuine issue of fact. Indeed, the Court has not even been provided with affidavits or declarations from a single defendant trustee.

The deposition testimony relied on by plaintiffs often consists of individuals indicating that they have no recollection of particular events, such as conducting due diligence with respect to Fund investments. Plaintiffs faced the difficult task of proving a negative, as many of the allegations relate to the defendants' failure to act. In light

---

released all claims for money damages against the current Employer Trustees. The only remaining claims against the trustee defendants, therefore, are the equitable claims against the current Employer Trustees.[14] Furthermore, as noted above, the claims against defendants McCarthy and Sombrotto are largely dependent on the trustee defendants' actions. Accordingly, and notwithstanding the settlement of the legal claims against the former trustees and the dismissal of the legal claims against the current Employer Trustees, the Court must still address plaintiffs' motion as it relates to the alleged breaches of fiduciary duty by all of the trustees. I address each of these claims in turn. The non-trustee defendants' (i.e, McCarthy and Sombrotto) role in these breaches is discussed separately.

### A. Failure to Collect Delinquent Contributions

Count One of the Amended Complaint seeks to hold all defendants liable for the

---

of the absence of any evidence from the defendants that they engaged in the sort of oversight required of them, the Court has deemed plaintiffs' evidence sufficient to establish the fact that the omissions described herein in fact occurred.

Finally, the Court notes that, notwithstanding defendant trustees' failure to properly support their opposition to plaintiffs' motion, the Court has carefully scrutinized the record before it in reaching its conclusions, and did not rely on plaintiffs' characterization of that record.

14. At a conference in late December with the Court and one of the two current Employer Trustees, the only objection of the current Employer Trustees to the settlement was on the ground that the proposed settlement, if agreed to, would leave the current Employer Trustees without representation on the remaining equitable claims. The trustees' insurer, whose representative also attended the conference, agreed to provide such representation, and it appears from the record that this resolved the remaining problem with respect to the current Employer Trustees and the proposed settlement.

Defendant McCarthy has also objected the settlement's allocation of settlement proceeds, specifically the proposed allocation of close to one million dollars to plaintiffs' counsel for legal fees. Should McCarthy be found liable for money damages, he will be able to argue, at that time, that any damages for which he is liable should be offset by some or all of the proceeds allocated to legal fees. While a legitimate concern, the Court need not reach this issue at this time.

trustees' failure to make the requisite effort to collect delinquent contributions and interest from employers. Plaintiffs contend that this failure constitutes both a breach of defendants' fiduciary duties under ERISA Section 404(a)(1), 29 U.S.C. § 1104(a)(1), and a prohibited transaction under ERISA Sections 406(a)(1) and 406(b)(2). 29 U.S.C. §§ 1106(a)(1), 1106(b)(2).

There is no dispute that the 966 Funds regularly waived interest on delinquent contributions and rarely, if ever, filed suit to seek delinquent contributions or the interest due thereon. It was the Funds' de facto policy not to seek interest on delinquent contributions paid within 90 days of their delinquency. See McCarthy Aff. ¶ 5; Tierney Depo. at 55. No written policy with respect to the collection of overdue contributions existed. Tierney Depo. at 52; Zaccherio Depo. at 67; Paul Depo. at 425.[15] There is also no dispute that significant employer delinquencies existed, with some payments 23 months overdue. McCarthy Aff. Exh. C. Of even more concern is the allegation that some of these employers were represented by McCarthy's brother, Randy, through National Consultants Associated, Ltd. ("NCA"). See Pl. Rule 56.1 Stmnt. ¶¶ 61, 70; McCarthy Depo. at 41 (admitting Randy McCarthy represented 966 employers); Zaccherio Depo. at 26.

Defendants concede that "the Funds incurred a loss but there is no proof that this was caused by any breach of duty by the Defendant Trustees and there is no proof offered that those monies cannot still be collected." Def. Mem. at 5. That is, defendants argue that because the unpaid interest and other delinquencies can (possibly) still be collected, defendants' acts do not amount to a breach of duty. Defendants make this same argument with respect to Fund investments. In each instance, they miss the point of plaintiffs' motion for *partial* summary judgment. The instant motion seeks to establish certain facts as to which there is no dispute and asks the Court to draw the appropriate legal consequences. The existence and extent of any loss awaits the trial. See *infra* Part I.C.1.

■ There can be no question that the trustees' failure to collect delinquent contributions and their failure to investigate whether such collection procedures were reasonable and feasible, to say nothing of their failure to provide a written policy guideline, constitute a breach of their fiduciary duties under ERISA Section 404(a)(1). 29 U.S.C. § 1104(a)(1). As the Court of Appeals has noted, "trustees have a fiduciary duty 'to act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries.'" *Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 916 (2d Cir.1989) (quoting *Central States, Southeast & Southwest Areas Pension Fund v. Central Transp., Inc.*, 472 U.S. 559, 571, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985)).

> In performing this duty, trustees have a range of options—including suing the delinquent employer, randomly auditing the employer's records, threatening work stoppages, picketing the employer, or similar actions—depending upon the circumstances. There is no duty to take any particular course of action *if another approach seems preferable.* Rather the trustees' duty is to act with 'care, skill, prudence and diligence,' 29 U.S.C. § 1104(a)(1)(B), in attempting to recover delinquent contributions or in declining to take a particular course of action to recover those contributions.

*Id.* at 917 (citations omitted).

As the *Diduck* court said so well, there is no obligation to institute legal action in every circumstance, regardless of the likelihood of success. *Id.* (trustees acted prudently in declining to sue insolvent employer). However, "[t]he trustees had a duty to investigate the possibility of a lawsuit and other options and to make an informed decision whether to

---

15. McCarthy testified repeatedly that no such written policy ever existed. Depo. at 72, 92, 129. He nevertheless claims to have presented the Funds with a proposed collection procedure. McCarthy Aff. Exh. E. Even this purported written procedure provides for the routine waiver of interest in cases where delinquent contributions are made prior to the initiation of litigation. *Id.* at 6.

pursue any. Failure to do so ... [is] a breach of such duty." *Ches v. Archer*, 827 F.Supp. 159, 167 (W.D.N.Y.1993); *see also Castaneda v. Baldan*, 961 F.Supp. 1350, 1354 (S.D.Cal.1997) ("as part of their fiduciary duty to make reasonable collection efforts, plan administrators must make a reasonable investigation and decision as to whether to initiate legal action to recover plan assets, such as delinquent contributions"). As the record is clear that the trustees engaged in no such individualized determinations as to the appropriateness of legal action, but rather regularly waived interest and failed to collect overdue principal, the Court concludes that as to this claim the defendants have failed to raise a genuine issue of material fact.

■ Similarly, there is no question but that the trustees' handling of delinquent contributions constituted a prohibited transaction under ERISA Section 406. That section prohibits: (a) the "lending of money or other extension of credit between the plan and a party in interest", ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B); and (b) fiduciaries from acting in "any transaction involving the plan on behalf of a party ... whose interests are adverse to the interests of the plan," ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2). Employers are parties-in-interest, 29 U.S.C. § 1002(14)(C), their interests are adverse to those of the plan, *Gruby v. Brady*, 838 F.Supp. 820, 833 (S.D.N.Y.1993), and "the employer's obligation to contribute to the Fund constitutes a transaction involving Fund assets." *Id.* Moreover, forgiving delinquent contributions and the interest due thereon constitutes the "extension of credit" between the plan and the employer. *See Central States*, 472 U.S. at 573 (referring to section 406(a)(1)(B)'s prohibition on extension of credit and noting "trustee responsibility for assuring full and prompt collection of contributions owed to the plan"); Prohibited Transaction Exemption 76–1, 41 Fed.Reg. 12740, 12741 (1976) ("if the plan is not making systematic, reasonable and diligent efforts to collect delinquent contributions ... such failure may be deemed to be a prohibited transaction") (quoted in *Castaneda*, 961 F.Supp. at 1356–57; *but see Castaneda*, 961 F.Supp. at 1356–57 (finding failure to collect

delinquent contributions does not state claim for section 406 prohibited transaction violation independent of breach of fiduciary duty claim). The Court therefore holds that the trustees' failure to diligently investigate and pursue delinquent contributions, including the interest due thereon, constitutes both a breach of their fiduciary duty and a prohibited transaction under ERISA.

### B. Travelers Insurance Plan

#### 1. Breach of Fiduciary Duty: ERISA Section 404

■ There is no question that the trustees' acquiescence in the Travelers arrangement constitutes a breach of fiduciary duty. None of the Health Fund minutes reflect any discussion by the trustees of the benefit to the Fund of permitting non-Local 966 members to participate in the Fund. *See* Pl. Rule 56.1 Stmnt. ¶ 140; Def. Response to Pl. Rule 56.1 Stmnt. ¶ 5 (admitting allegations). At the December 16, 1992 Health Fund meeting, McCarthy requested authority to have the Fund certified as a Multiple Employer Welfare Arrangement, and the trustees authorized him to do so. Health Fund Mins. Dec. 16, 1992 at 5–6. At the April 15, 1993 Health Fund meeting, the trustees approved the participation in the Health Fund of employers with collective bargaining agreements with Local 1019, on condition that the 966 Health Fund actuary approve their participation and that each Employer's contribution rate be based on "the utilization/experience of the participants and beneficiaries on whose behalf the Employer is required to make contributions." Health Fund Mins. April 15, 1993 at 7. This followed a request from Local 1019 that its members be allowed to participate in the Fund, signed by Local 1019 President Stephen Sombrotto, brother of defendant Vincent Sombrotto. *See* Pl. Exh. T.

The requested approval from the fund actuary was never received. Pl. Rule 56.1 Stmnt. ¶ 165; Def. Response to Pl. Rule 56.1 Stmnt. ¶ 1. Rather, the actuary stated that in order to provide the requested assessment the following information regarding Local 1019 members would be necessary: age, sex,

location, previous claim history and industry of employment. Pl. Exh. U. The actuary concluded, "[w]ithout most of the information we cannot give you a figure to use." *Id.* This information was never compiled or provided to either the trustees, the actuary or Travelers. Gonzalez Depo. at 130–31; Zaccherio Depo. at 195, 201–02; Tierney Depo. at 180–83, 210 (Travelers was not given claims information regarding Local 912 and 1019 members "because we [Local 966] didn't have that information"), 218. Indeed, defendant Gonzalez stated at his deposition, in response to a question regarding his knowledge about Local 1019's membership: "No [I did not have that kind of information], and I don't see any reason to have it, that's none of my business what 1019 does." Gonzalez Depo. at 132.[16]

The problem with this response, of course, is that it *was* Gonzalez' business—just as it was the business of the other trustees in light of the decision to allow Local 1019 members to participate in the 966 Health Fund. Such a decision might, of course, among other things, result in higher premiums and thus require a further and larger contribution from the 966 Health Fund. It is this attitude—the total lack of any investigation or due diligence—that apparently characterized most if not all of the trustees' actions and is at the core of the other fiduciary breach allegations discussed below.

A similar yarn is spun with regard to Local 912's participation in the 966 Health Fund. The only added twist is that the trustees, on December 15, 1993, at the suggestion of defendant McCarthy, retroactively amended the minutes of their April 15, 1993 meeting to correct the alleged "oversight" in those minutes, which failed to reflect approval of Local 912's participation. Health Fund Mins. Dec. 15, 1993 at 7. The problem with such an amendment is that it does not appear that Local 912 requested to participate in the

Health Fund until May 20, 1993, more than a month after the April 15 meeting. *See* Pl. Exh. W. The retroactive amendment of the minutes to reflect an event that had not yet occurred is another example of the trustees' total abdication of any oversight responsibility with respect to the Travelers arrangement and the participation of Locals 912 and 1019 in the activities of the 966 Health Fund. It is also a troubling example of McCarthy's control over the trustees. The trustees of the 966 Health Fund displayed the same lack of knowledge with respect to the facts and potential consequences with respect to Local 912 as were evidenced in their decision with respect to Local 1019's participation. *See generally* Pl. Rule 56.1 Stmnt. ¶¶ 237–46; Gonzalez Depo. at 156; Zaccherio Depo. at 228, 230, 242; Tierney Depo. at 210. As the above demonstrates, the trustees completely failed in their duties to perform even the most minimal investigation as to the wisdom, appropriateness and propriety of allowing Locals 912 and 1019 to participate in the 966 Health Fund.

While the trustee defendants argue that the 966 Health Fund incurred no loss as a result of their conduct, these findings are nevertheless relevant and provide support for plaintiffs' equitable claims against the current Employer Trustees and McCarthy. Furthermore, in light of the holding below as to Sombrotto's fiduciary status, these findings limit the issues at trial to the existence and extent of any damages.[17] Should McCarthy be found to be a fiduciary after trial, these findings will also be applicable to the breach of fiduciary duty claims against him.

### 2. Prohibited Transactions: ERISA Section 406

■ Plaintiffs contend also that the Travelers insurance arrangement constitutes a prohibited transaction because it resulted in "transfer to, or use by or for the benefit of, a

---

16. Gonzalez also made a similar comment regarding McCarthy's undisclosed representation of Locals 912 and 1019 at the same time as he served as counsel to Local 966. "I didn't know if he represented them or not, it's not my business." Gonzalez Depo. at 154.

17. The Court notes that in addition to his liability as a fiduciary pursuant to his power, as Local President, to appoint and remove Union Trustees, Sombrotto was actively involved in the Travelers arrangement. This involvement alone would likely render him a fiduciary with respect to Travelers regardless of his liability as Local President.

party in interest, of any assets of the plan" in violation of ERISA Section 406(a)(1)(D). 29 U.S.C. § 1106(a)(1)(D). As noted above, the Travelers plan involved employers paying inflated premiums to employer organizations (AOS and NPA). These employer organizations apparently served no purpose ·other than to recruit businesses so that their employees could receive health care coverage at what appear to be inflated prices. These employer organizations would keep up to one-half of the money and forward the rest to Locals 912 and 1019, with whom they had "collective bargaining agreements."[18] Locals 912 and 1019 would then forward the premiums to Local 966, which in turn would pay Travelers.

In order for a particular transaction to run afoul of Section 406(a)(1)(D) it must involve (1) a transfer (2) to a party in interest (3) of plan assets. The transfer at issue in the Travelers arrangement was the transfer of the premiums paid by Local 1019 employers to AOS; from AOS to Local 1019; from Local 1019 to Local 966 and from Local 966 to Travelers. The parties in interest involved are: (1) Peter Zappasodi, the principal of AOS, who received income from AOS; (2) Michael Kauffman, who was paid by AOS to solicit clients; and (3) Bryan McCarthy, who was counsel to Locals 912 and 1019 and received payment from these Locals for his services. Zappasodi and Kauffman are parties-in-interest because they are service providers to the Funds. 29 U.S.C. § 1002(14)(B). McCarthy is a party-in-interest because he was Funds counsel and remains the counsel for the 966 Employer Trustees. 29 U.S.C. § 1002(14)(A).

The "plan assets" that plaintiffs contend were transferred to these parties-in-interest were the excess fees paid by the Local 1019 employers for the Travelers coverage. As noted above, the employers paid significantly more for such coverage than Local 966 was paying Travelers. The excess went to AOS—and indirectly to Zappasodi and Kauff-

man, and to Local 1019—and indirectly to Bryan McCarthy.

In support of their contention that these excess charges constitute "plan assets" under Section 406, plaintiffs rely on *In Re Consolidated Welfare Fund ERISA Litigation,* 839 F.Supp. 1068 (S.D.N.Y.1993) (*"Consolidated"*). The Court in *Consolidated* was faced with a similar arrangement in which the defendant acted as a broker for small businesses seeking health care coverage for their employees, similar to the· role AOS played here. Defendant entered into "collective bargaining agreements" with the union local and then entered into "adoption agreements" with the various employers, pursuant to which the employers could enroll their employees in the union local and be eligible for health care coverage. *Id.* at 1069–70. Similarly here, AOS entered into a collective bargaining agreement with Local 1019 and then entered into individual agreements with respect to each employer recruited. The defendant in *Consolidated,* like AOS, kept a portion of the employers' contributions as a commission. *Id.* at 1070.

The *Consolidated* court held such commissions constituted plan assets and that the arrangement therefore violated Section 406 and plaintiffs urge this Court to follow suit. A close analysis of *Consolidated,* however, reveals two crucial distinctions ·that preclude summary judgment for plaintiffs. First, as noted in *Consolidated,* "in the absence of an explicit statutory definition, the term 'assets of the Plan' should be determined by the documents governing the relationship between the Fund and the employers." *Id.* at 1073; *cf. Galgay v. Gangloff,* 677 F.Supp. 295, 301–02 (M.D.Pa.1987) (absent congressional definition of plan assets over which an individual must have control to be a fiduciary, the court looks to collective bargaining agreement). Here, as in *Consolidated,* those documents consist of the agreement between the broker (AOS) and the union local on the one hand and the employers and the broker on the other hand.

---

18. As noted above, these "collective bargaining agreements" were between the employer organization, on behalf of its member employers, on the one hand, and the Local on the other hand. This odd arrangement, in which an employer organi- zation enters into a collective bargaining agreement on behalf of its members, can be explained by remembering the real purpose behind these agreements—to provide health care coverage and generate profits.

In *Consolidated*, the Court noted that the Trust Agreement at issue there provided that employer contributions constitute the trust estate and defined such employer contributions as the payments an employer is required to make to the Funds. *Id.* Furthermore, the agreements between the broker and the employers specifically stated that the required contributions were "monthly contributions to the Welfare Fund." *Id.* Relying on these provisions, the *Consolidated* court held that the full employer contributions constituted "plan assets" and that the "skimming" of commissions by the defendant broker constituted a prohibited transaction. *Id.*

An examination of the relevant documents at issue here reveals that there is some question as to whether the excess premiums constitute plan assets. Unlike the agreements in *Consolidated*, the agreements between AOS and the employers explicitly state that the inflated premium the employers were charged "includes Association dues, Union dues and Pension fund contributions." Moreover, Local 966's Trust Indenture defines the Trust as consisting of "the entire trust estate ... including ... all funds *received* in the form of contributions." Sombrotto Exh. 1, Art. I, § 8 (emphasis added). This is in contrast to *Consolidated*, where the trust agreement defined the trust's estate as consisting of "employer contributions." The parties have not briefed this point, nor have they made reference to the Trust Indentures, which were submitted by defendant Sombrotto for wholly different reasons. Accordingly, the Court finds that there exist material issues of fact as to whether the full amount of the employer contributions constitute plan assets for purposes of Section 406.[19]

The second significant distinction between *Consolidated* and the case at bar is the existence of the "go between" unaffiliated Locals—Locals 912 and 1019. Even if the excess premiums were determined to be plan assets, the question arises as to whether they

were assets belonging to Local 966 or to Locals 912 and 1019. Again, the parties have not briefed this issue. The Court doubts very much that the use of such "go-between" locals can insulate an otherwise improper transaction, for such an outcome would merely provide sophisticated swindlers with an opportunity to evade the statute's carefully constructed prohibitions. Nevertheless, as the parties have not addressed this issue either, I find that summary judgment is inappropriate because questions of fact remain as to whether the excess premiums constitute "plan assets" of Local 966.[20]

### C. Fiduciary Breaches: Investments

Plaintiffs assert a variety of claims relating to the trustees' handling of fund investments: failure to implement an investment policy; failure to diversify Fund assets; failure to retain investment advisers; failure to properly investigate Fund investments; failure to monitor the Pension Fund's solvency and the failure to exercise due diligence in selecting service providers for the Funds. Although styled as separate causes of action, the allegations in effect amount to charges that defendants' conduct in running the Funds violated ERISA's general fiduciary duty provision, ERISA § 404(a)(1)(B), and the specific ERISA requirement that assets be diversified (count four), ERISA § 404(a)(1)(C). 29 U.S.C. §§ 1104(a)(1)(B), 1104(a)(1)(C). While the Court will address each allegation separately to determine whether any material issues of fact exist, it is important to keep in mind the mosaic that emerges when all the allegations are looked at together, ERISA requires that fiduciaries discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). It is

---

19. Nor have the parties provided the Court with information from which to determine if the fees at issue were deducted from employee pay. *See* 29 C.F.R. § 2510.3–102 (plan assets include amounts withheld from employee wages).

20. McCarthy's involvement in the Travelers arrangement, and the legal consequences therefrom, are discussed below. It is significant to note that if the Travelers arrangement is proven to be a prohibited transaction, McCarthy can be held liable even absent a finding of fiduciary status. *See infra* Part II.B.2.

against this setting that the challenged actions must be measured.

### 1. Loss

■ While each of the above-listed claims is discussed individually below, I first discuss the trustees' common defense to each of these claims. Defendants contend that "[e]ven if, arguendo, the Defendant Trustees herein were found to have breached their fiduciary duties, they cannot be held liable under ERISA without also proving a causal connection between their alleged wrongdoing and the loss to the Fund." Def. Mem. at 6. This is also the basis for the defendant trustees' motion for summary judgment on all the claims against them.

This argument fails for several reasons. First, it ignores one of the important functions of motions for partial summary judgment: the narrowing of issues for trial. Thus, the finding that the trustees did in fact breach their fiduciary duties would eliminate the need for a trial on that issue, and limit the trial to the "causal connection" defendants claim is missing and the extent of the damages, if any.

Second, plaintiffs have raised an issue of material fact as to the existence of a loss, sufficient to withstand defendants' motion for summary judgment. In this regard, plaintiffs have submitted an expert opinion from Jack C. Marco, president of the Marco Consulting Group, the largest provider of investment consulting to Taft–Hartley plans with 50 employees or more. *See* Levy Aff. Exh. 2. In his report, Mr. Marco concludes that the Local 966 Pension Fund "underperformed all of the Taft–Hartley plans measured by the Marco Consulting Group. The annualized return for the plan was 6.5% per year versus the average (median) Taft–Hartley plan which earned 11.2% per year." *Id.* at 2. He estimated the underperformance of the plan at between $10.2 million and $13.4 million. *Id.* While such a report does not establish the existence of loss (or its extent) as a matter of law, it suffices to state a prima facie case of loss. This is especially true where, as here, the allegations of fiduciary breaches relate to the overall investment strategy of the Funds (or the lack thereof) as opposed to the wisdom of a single transaction or investment.

*See Dardaganis v. Grace Capital Inc.,* 889 F.2d 1237, 1244 (2d Cir.1989) ("Where, as is in this case, the breach arises from a pattern of investment rather than from investment in a particular stock, courts will rarely be able to determine, with any degree of certainty, which stock the investment manager would have sold or declined to had he complied with investment guidelines.... [Rather,] the District Court should presume that, but for the breach, the funds would have been invested in the most profitable of the alternatives ...."). In a case such as this, where all the investments are alleged to have been improper, the "alternatives" to which the Fund must be compared are other properly managed funds. Thus, the only manner in which plaintiffs can show loss is to establish what a reasonable investor would have done and how such investments would have performed. Such a measure of loss has been repeatedly recognized as legitimate. *Id.* at 1243; *Donovan v. Bierwirth,* 754 F.2d 1049, 1056 (2d Cir.1985) (*Bierwirth*) ("the measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned ... with what the Plan would have earned had the funds been available for other Plan purposes"). Plaintiffs will bear the burden of proof with respect to causation and extent of damages at trial. They are not required to make such a showing at this stage. They have only moved for partial summary judgment with respect to the question of whether the trustees' acts constituted a breach of fiduciary duty.

Third, as noted above, plaintiffs seek the removal of the current Employer Trustees and McCarthy. The propriety of such relief is based on the *conduct* of these defendants, and not the existence or extent of losses caused by such conduct. *Brock v. Robbins,* 830 F.2d 640, 647 (7th Cir.1987). Thus, the Court's findings with respect to defendants' actions may suffice to grant such relief.

### 2. Investment Policy and Guidelines

■ Count three of the Amended Complaint alleges that the defendants "failed to implement any investment policy and guidelines for the investment of fund assets" and thereby breached their fiduciary duties. Amended Compl. ¶ 37. Defendants concede

that "[t]he Trustees did not maintain a formal written investment policy or guidelines." Def. Rule 56.1 Stmnt. ¶ 14. They allege, however, that the Funds invested only in U.S. government securities, U.S. Treasury issues, various other government-backed securities or bonds, Guaranteed Insurance Contracts, money market and mutual fund accounts with accredited institutions and taxi-medallion loans through Metran Funding. *Id.* ¶ 13 (containing no cites to the evidentiary record). Plaintiffs respond to this alleged "unwritten policy" by arguing that the fact that these investments were made does not mean they were made pursuant to an investment policy [21] and that the above policy would in any event be imprudent. That no written policy existed is not in dispute; neither is the nature of the Funds' investments (discussed more fully below). What is in dispute is whether the absence of such a policy and the ad hoc nature of the Funds' investment decisions violates ERISA's fiduciary duty provision.

ERISA does not contain a specific requirement that a written investment policy be maintained by the trustees. I find, at least in this instance, that such a policy is necessary to insure that the plan investments are performing adequately and meeting the actuarial, liquidity and other needs of the Funds. Support for this proposition is found in Department of Labor regulations.

> The maintenance by an employee benefit plan of a statement of investment policy designed to further the purposes of the plan and its funding policy is consistent with the fiduciary obligations set forth in ERISA § 404(a)(1)(A) and (B).... For purposes of this document, the term 'statement of investment policy' means a written statement that provides the fiduciaries who are responsible for plan investments with guidelines or general instructions concerning various types or categories of investment management decisions .... A statement of investment policy is distinguished

from directions as to the purchase or sale of a specific investment at a specific time ....

29 C.F.R. § 2509.94–2(2). While this regulation states only that a written investment plan is "consistent" with ERISA's fiduciary duty requirements, in the circumstances here, absence of any plan constitutes a breach of fiduciary duty. Further, I hold that on the facts of this case there are no genuine issues of material fact with respect to the allegations that the trustees had no investment policy and that the absence of such a policy, coupled with the other acts and omissions by the trustees of these Funds, constituted a breach of fiduciary duty.

### 3. Investment Advisers

■ Count five of the Amended Complaint alleges that defendants breached their fiduciary duties by failing to hire an investment adviser or investment manager. Amended Compl. ¶ 41. The trustees admit that they did not retain the services of an investment adviser or investment manager during the period in question. Def. Response to Pl. Rule 56.1 Stmnt. ¶ 1; Pl. Rule 56.1 Stmnt. ¶¶ 83, 85. Moreover, defendant trustees admit that they lack expertise and substantial experience in the field of investments. Def. Response to Pl. Rule 56.1 Stmnt. ¶ 1; *see* Pl. Rule 56.1 Stmnt. ¶ 80; *see also* Zaccherio Depo. at 41–42; Pasqualone Depo. at 34, 43–44; Gonzalez Depo. at 34; Finley Depo. at 14–15.

As with adoption of a written investment policy, there is no specific statutory or regulatory requirement that employee benefit plans hire an investment adviser. The Court of Appeals for this Circuit, however, has recognized that in certain circumstances trustees have a "duty to seek outside assistance" as part of their fiduciary obligations. *Katsaros v. Cody*, 744 F.2d 270, 279 (2d Cir.1984). *Katsaros* involved a situation much like the one at issue here, at least as

---

**21.** Defense counsel avers that "[t]he investment policy of the Defendant Trustees ... is self evident through the consistent type of investments entered into ...." Campbell Aff. ¶ 44. Such an argument misses the point. The mere fact that the trustees entered into certain investments does

not render such investments part of an "investment policy." Defendants' argument would render any investment decision, no matter how arbitrary, part of a "self evident" policy to make such investments.

far as the trustees' investment acumen was concerned:

> At trial, [the trustees' CPA] testified that neither he nor anyone on the Fund's staff had sufficient training to express an opinion as to the soundness of the loan. None of the trustees had an accounting or banking background. They were wholly unequipped personally to analyze the figures presented to them to find out whether any serious financial problems were faced by the prospective borrower. They lacked any expertise in such important matters as capital adequacy, quality of assets, liquidity, the value of the bank's stock, and the like.... No effort was made to obtain independent professional assistance or analysis of the financial data presented to them.

*Id.* at 275.

■ In such circumstances, where the trustees lack the requisite knowledge, experience and expertise to make the necessary decisions with respect to investments, their fiduciary obligations require them to hire independent professional advisors. *See United States v. Mason Tenders Dist. Council of Greater New York,* 909 F.Supp. 882, 886 (S.D.N.Y.1995) (*Mason Tenders* ) ("a trustee has a duty to seek independent advice where he lacks the requisite education, experience and skill"); *Trapani v. Consolidated Edison Employees' Mutual Aid Society,* 693 F.Supp. 1509, 1516 (S.D.N.Y.1988) ("A fiduciary who is ill-equipped to evaluate a claim may have a duty to seek outside assistance."); *see also* 29 U.S.C. § 1104(a)(1)(B) (standard of care measured against "prudent man ... familiar with such matters"); *Katsaros,* 744 F.2d at 279 ("[a] trustee's lack of familiarity with investments is no excuse"). This does not mean that all trustees must hire investment advisors or asset managers with respect to every investment decision. Indeed, ultimate decision-making authority and responsibility for investments rests with the trustees. *See Mason Tenders,* 909 F.Supp. at 886 (trustee must make own decision based on advice). The need for independent advice will depend on the factual circumstances of each case.

Here, it was essential and totally lacking. Such assistance can come in many forms—it can encompass an overall investment strategy; advice with respect to particular proposed investments or delegation of day-to-day investment authority with appropriate oversight. Nothing like that happened here and the trustees were without any basis by which to measure the wisdom or propriety of any particular investment.

The allegations are not that a particular investment decision was flawed. Rather, plaintiffs' challenge is to the process by which such decisions were made, a process characterized by an astounding naivete evidencing a lack of basic investment techniques and knowledge. While in other circumstances the failure to hire an investment advisor might not be actionable, under the circumstances here present it is another facet of a pattern and practice that can only be characterized as the total abdication of their responsibilities as trustees to act as the guardians of Local 966 members' property.

### 4. Investigation of Fund Investments

■ Plaintiffs also allege that the trustees breached their fiduciary obligations by failing to properly investigate proposed fund investments. Amended Compl. ¶ 43. It is by now black-letter ERISA law that "the most basic of ERISA's investment fiduciary duties [is] the duty to conduct an independent investigation into the merits of a particular investment." *In Re Unisys Savings Plan Litig.,* 74 F.3d 420, 435 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 56, 136 L.Ed.2d 19 (1996). "The failure to make any independent investigation and evaluation of a potential plan investment" has repeatedly been held to constitute a breach of fiduciary obligations. *Whitfield v. Cohen,* 682 F.Supp. 188, 195 (S.D.N.Y.1988); *see Roth v. Sawyer–Cleator Lumber Co.,* 16 F.3d 915, 918 (8th Cir.1994) ("a fiduciary is obligated to investigate all decisions that will affect the pension plan"); *Mason Tenders,* 909 F.Supp. at 887 ("[t]he failure to make any independent investigation and evaluation of a potential plan investment is a breach of fiduciary obligations").[22]

---

**22.** As with the other breaches of the prudence standard, breach alone does not establish liabili-

■ Moreover, the ERISA regulations dealing with fiduciary responsibility provide: (1) With regard to an investment or investment course of action taken by a fiduciary of an employee benefit plan pursuant to his investment duties, the requirements of section 404(a)(1)(B) of the Act ... are satisfied if the fiduciary:.

(i) Has given appropriate consideration to those facts and circumstances that ... the fiduciary knows are relevant to the particular investment or investment course of action involved, including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties.

29 C.F.R. § 2550.404a–1(b). The regulation then goes on to define the "appropriate consideration" that is to be given to the facts and circumstances:

"[A]ppropriate consideration" shall include ... [a] determination by the fiduciary that the particular investment or investment course of action is reasonably designed, as part of the portfolio ... to further the purposes of the plan, taking into consideration the risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action, and [c]onsideration of ... (A) [t]he composition of the portfolio ... (B) [t]he liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and (C) [t]he projected return of the portfolio relative to the funding objectives of the plan.

*Id.* As the above regulation makes clear, trustees must investigate proposed investments with regard to risk and return as well as appropriateness in light of the composition and aims of a funds's portfolio.[23]

■ "The court's task is to inquire whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *Katsaros,* 744 F.2d at 279 (quotation omitted). An examination of the record here establishes that defendants most definitely did not do so and rather that they completely failed to meet their investigatory duties with respect to a variety of Fund investments.

The trustees repeatedly made investments—sometimes totalling over 25% of the Pension Fund's assets—without any independent investigation, but based solely on the advice of a broker, whose credentials they never reviewed. From 1989 through June 1994 there existed an investment subcommittee in both Funds consisting of one Employer and one Union Trustee. Def. Response to Pl. Rule 56.1 Stmnt. ¶ 1; Pl. Rule 56.1 Stmnt. ¶ 91. The broker, David Sigman, would telephone (or on occasion, write) the Fund Manager, John Tierney, with a suggested investment. Sigman Depo. at 51; Tierney Depo. at 34–35, 141–42, 474. Tierney would then convey the recommendation to the subcommittee members. Tierney Depo. at 35; Zaccherio Depo. at 57; Smith Depo. at 147–48. The subcommittee would not meet, but rather caucus by phone and decide whether to accept the recommendation and proceed with the investment. Zaccherio Depo. at 40; Gonzalez Depo. at 106; Sigman Depo. at 50; Smith Depo. at 146–49. While the trustees approved virtually every single security recommended by Sigman, Tierney Depo. at 39, there is not a single written line evidencing any analysis or investigation into the risks involved in, or the wisdom of, a proposed

---

ty, as plaintiffs must still establish causation and loss. In order to recover damages for breach of the duty to investigate, therefore, plaintiffs must demonstrate that the investments at issue are objectively imprudent based on what the trustees should have known had they conducted a proper investigation. *Fink v. National Savings and Trust Co.,* 772 F.2d 951, 962 (D.C.Cir.1985) (Scalia, J. concurring in part, dissenting in part). Plaintiffs have provided no evidence with respect to what a proper investigation would have revealed. As stated above, such a showing is reserved for trial as the Court is merely addressing the issue of

whether the trustees' conduct constitutes a breach of duty.

**23.** The regulation's reference to "the role the investment ... plays in ... the plan's investment portfolio" further supports the conclusion, discussed above, that plans require investment policies, for it is only against such a benchmark that the determination can be made as to what role a particular investment plays in the overall portfolio.

investment. Tierney Depo. at 70–72. Moreover, Sigman did not provide the subcommittee members with written material upon which they could base a meaningful decision with respect to his choices. Sigman Depo. at 73–74; Tierney Depo. at 43, 141–42; Gonzalez Depo. at 76; Finley Depo. at 18–19. All the while, the trustees never monitored Sigman's performance nor did they question, inquire into or know the extent of the commissions he was earning. Zaccherio Depo. at 49–50; Def. Response to Pl. Rule 56.1 Stmnt. ¶ 1; Pl. Rule 56.1 Stmnt. ¶¶ 98, 100.

Particularly shocking and at the same time illuminating is the decision by the trustees to purchase $8.6 million in Collateralized Mortgage Obligations ("CMO"). The investment was recommended by Sigman in a letter dated March 21, 1994 and was described as follows: "I recommend the purchase of [a] collateralized mortgage obligation yielding 7.5% with an average life of 9.5 years backed by the Federal National Mortgage Association. Should interest rates fall, the average life may shorten as [sic] if interest rates rise, the average life may lengthen." Pl. Exh. K. The trustees approved the transaction the very next day. *Id.* While this single investment constituted over 25% of the entire Pension Fund, not a jot exists to demonstrate any deliberation or investigation as to the prudence of such an investment. Another example of the trustees' lack of basic investigation is their failure to investigate the prudence, safety or competitive return of the $5–6 million they regularly invested in second mortgages on taxis. *See generally* Pl. Rule 56.1 Stmnt. ¶¶ 126–27, 132–33.

On this record, there is no genuine issue of fact as to whether the trustees fulfilled their fiduciary obligations to investigate the merit, structure and prudence of the various investments they made. Indeed, their modus operandi—blind reliance on a broker whose livelihood was derived from the commissions he was able to garner—is the antithesis of such independent investigation.[24]

24. The trustees apparently rubber-stamped the decisions of the investment subcommittee. Flores Depo. at 27. No evidence has been presented to the Court of any instance in which Sigman's recommendation was not accepted by the subcommittee or the subcommittee's actions were not approved by the trustees. *See* Tierney Depo. at 39 (trustees approved "90, 95 percent" of Sigman's recommendations).

### 5. Monitoring the Pension Fund's Solvency

In their seventh cause of action plaintiffs allege that the trustees' failure to monitor the Pension Fund's solvency and adjust benefit levels and employers' withdrawal liability accordingly also constituted a breach of their fiduciary obligations. Amended Compl. ¶¶ 45–47. Failure to monitor a fund's solvency and adjust levels, if proved, constitutes a breach of fiduciary duty. *Gruby,* 838 F.Supp. at 825, 829 (allegations of failure to reduce benefit levels in pension fund states claim for breach of fiduciary duty); *see also Dippel v. Joint Bd. of Trustees of the Operating Engineers Trust Fund,* No. 80–0271, 1982 WL 2085 (D.D.C. May 6, 1982) at *7 ("The Board obviously retains the discretionary authority and indeed the fiduciary obligation to alter existing types and levels of medical benefits available under the Plan when the financial solvency of the Fund so requires.") (dicta); *cf. Baum v. Nolan,* 853 F.2d 1071, 1074–75 n. 2 (2d Cir. 1988) (possibility that payment of pension benefits may affect fund's solvency is matter of fiduciary duty) (dicta).

There can be no question that the Pension Fund's solvency worsened with each passing year. A simple examination of the Pension Fund's minutes reveals the following: In 1989, the ratio of costs to contributions stood at a troubling $1.35/$1.00. Pension Fund Mins. Dec. 18, 1990 at 6. For the first 9 months of 1990 that figure stood at $1.48/$1.00. *Id.* By 1991, the figure grew to $1.78 spent for every dollar of contribution. Pension Fund Mins. Dec. 16, 1992 at 5. The disparity between income and expenses continued to rise, reaching $1.93/$1.00 in 1992 and a staggering $2.09/$1.00 for the first part of 1993. Pension Fund Mins. Oct. 4, 1993 at 5.

Notwithstanding these increasingly alarming figures about the Fund's solvency, the trustees did nothing, except to investigate a risky letter-of-credit investment that

was never consummated.[25] Tierney Depo. at 92, 120, 125–26, 128, 351–52. After the IRB/IBT trusteeship was imposed on Local 966, the new Union Trustees repeatedly suggested that the Fund hire an investment adviser for the Pension Fund, suggestions which were just as repeatedly rejected by the Employer Trustees. See Pension Fund Mins. June 23, 1994 at 2; July 24, 1995 at 5. No change was made in benefit levels nor was any change made in employers' withdrawal liability. As of January 1, 1995, the Fund faced an unfunded vested liability in excess of $13 million. See Pl. Exh. LLL. In light of this clear record, there can be no doubt but that the trustees breached their fiduciary duty by failing to take action to correct the growing problem with the Pension Fund's solvency.

### D. Selecting Service Providers

Plaintiffs' ninth cause of action alleges that the trustees breached their fiduciary obligations by failing to exercise due diligence in the selection of service providers to the Health Fund. Amended Compl. ¶¶ 52–55. These allegations are particularly disturbing because so many of the Funds' service providers were shown to have made payments to relatives of defendant McCarthy for unidentified consulting services. In effect, this claim is a variant on the allegations discussed above regarding the trustees' failure to investigate the prudence of their investments. Looking at both claims in a light most favorable to the trustees, they displayed the same lack of diligence in approving relationships with the Funds' service providers as they did in investing Fund assets.

Failure to utilize due care in selecting and monitoring a fund's service providers constitutes a breach of a trustees' fiduciary duty. Whitfield v. Tomasso, 682 F.Supp. 1287, 1304 (E.D.N.Y.1988) (Tomasso ); Brock v. Crapanzano, Civ. A. No. 84–1899, 1986 WL 15752 (S.D.Fla. July 23, 1986) at *7–8, aff'd, 819 F.2d 1148 (11th Cir.1987); see generally Martin v. Consultants & Administrators, Inc., 966 F.2d 1078, 1087–89

(7th Cir.1992) (recognizing claims for improper bidding process, failure to monitor service providers and failure to recover kickbacks). At the very least, trustees have an obligation to (i) determine the needs of a fund's participants, (ii) review the services provided and fees charged by a number of different providers and (iii) select the provider whose service level, quality and fees best matches the fund's needs and financial situation. See, e.g., Tomasso, 682 F.Supp. at 1304 (fiduciary obligation includes consideration of participant needs, solicitation of proposals and competent evaluation of competing proposals). Trustees also have an ongoing obligation to monitor the fees charged and services provided by service providers with whom a fund has an agreement, to ensure that renewal of such agreements is in the best interest of the fund. See Martin, 966 F.2d at 1088–89 (discussing "ERISA's imposition of a continuing fiduciary duty" in context of bidding and monitoring responsibilities).

The record is clear that the trustees never engaged in any comparative shopping or the solicitation and consideration of other bids with respect to any of the Health Fund's service providers. Indeed, defendants admit the allegations that they did not solicit or consider alternate bids for comparison prices for many of the service providers, even when these providers sought fee increases (which were regularly granted). Def. Response to Pl. Rule 56.1 Stmnt. ¶ 1; Pl. Rule 56.1 Stmnt. ¶¶ 33, 36, 40, 41; see also Gonzalez Depo. at 110, 112 (never personally conducted comparisons and recalls no such information); Zaccherio Depo. at 202–03 (no competitive bids or comparison pricing); Tierney Depo. at 156, 171 (same). In light of the uncontested evidence, it is clear that the trustees breached their fiduciary obligations with respect to soliciting and monitoring service providers to the Health Fund. This breach is all the more troubling in light of the aforementioned connection between these service providers and Bryan McCarthy's brothers. See infra note 27 (cataloging service provider payments to McCarthy family businesses). Cf. Martin,

---

25. The search for the letter of credit in fact resulted in millions of uninvested dollars being

held for several years. See infra Part I.E.

966 F.2d at 1089–90 (recognizing claim against trustees for failure to take action to recover kickbacks paid by service providers through trustee's brother-in-law); *Crapanzano,* 1986 WL 15752 at *7 ("total abdication of fiduciary responsibility" in permitting co-fiduciaries to select and overcompensate entity owned by two Benefit Committee members).

## E. Diversification of Fund assets

 Plaintiffs' fourth cause of action alleges that defendants breached their fiduciary duties and ERISA's specific requirements by failing to diversify investments as required by ERISA Section 404(a)(1)(C). Section 404(a)(1)(C) requires fiduciaries to discharge their duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C). "Under the duty of diversification, the trustee should not normally invest all or an unduly large portion of plan funds in a single security, or in any one type of security, or even in various types of securities that depend on the success of one enterprise." *Bruner v. Boatmen's Trust Co.,* 918 F.Supp. 1347, 1353 (E.D.Mo.1996). Breach of the duty to diversify constitutes an independent basis of liability, separate from a breach of the general duty of prudence. *Dardaganis,* 889 F.2d at 1241; *Marshall v. Glass/Metal Ass'n and Glaziers and Glassworkers Pension Plan,* 507 F.Supp. 378, 383–84 (D.Haw.1980).

 "Congress chose not to legislate a specific percentage limit on any one investment. Instead, it imposed a requirement of diversification that depends upon the facts and circumstances surrounding each plan and investment." *Id.* at 383; *Lanka v. O'Higgins,* 810 F.Supp. 379, 387 (N.D.N.Y. 1992); *Reich v. King,* 861 F.Supp. 379, 383 (D.Md.1994) ("*King I* "). That is, there is no "per se" violation of Section 404(a)(1)(C), as each case turns on its unique facts and circumstances. *Id.* at 385. Once plaintiffs have established a prima facie case of failure to diversify, the burden of persuasion shifts to defendants to show that the investments at issue were nevertheless "clearly prudent" under the circumstances. *Reich v. King,* 867 F.Supp. 341, 343 (D.Md.1994) (*King II* ); *Lanka,* 810 F.Supp. at 386–87.

 In making the determination as to whether the diversification requirement was breached and whether defendants have met their burden of establishing prudence, the Court is to consider (1) the purpose of the plan, (2) the amount of plan assets, (3) financial and industrial conditions, (4) the type of investment, (5) the distribution as to geographical location, (6) the distribution as to industries, and (7) the dates of maturity. *Id.* at 386 (citing H.R.Rep. No. 93–1280, 93d Cong., 2d Sess. 304, *reprinted in,* 1974 U.S.C.C.A.N. 4639, 5038, 5084–85). Such determinations require factual findings and are usually made on the basis of expert testimony after trial. *King I,* 861 F.Supp. at 385 & n. 6.

It is not entirely clear from plaintiffs' papers which investments they claim breached the duty to diversify. In their memoranda, plaintiffs appear to focus on the $8.6 million in CMOs discussed above, although they also mention the large amounts of cash ($8–$10 million) kept in a money market account for two to three years while the trustees pursued an elusive letter of credit investment. Pl. Mem. at 11–13; Pl. Reply Mem. at 4–5. The Pension Fund had approximately $30 million in assets at all relevant times. The $8.6 million thus represented over 25% of Plan assets. Plaintiffs cite cases in which investments of similar proportion were found to violate ERISA's diversification requirement and argue that summary judgment is therefore appropriate. *See, e.g., Marshall,* 507 F.Supp. at 383–84 (enjoining investment of 23% of plan assets in speculative real estate project). As noted above, however, there is no set percentage that constitutes a per se violation of ERISA's diversification requirements. Although plaintiffs have provided the Court with a single expert affidavit that makes reference to the diversity requirement, *see* Brossman Aff., it does not address the factual analysis necessary to allow the Court to make a finding with respect to the diversification issue. Plaintiffs' motion for

summary judgment is therefore denied on this claim.[26]

## II. Bryan McCarthy

As noted above, defendant Bryan McCarthy was counsel to the Funds until the Local was placed in Trusteeship and new Union Trustees were appointed. Since that time he has served as counsel to the Employer Trustees. Plaintiffs seek to hold McCarthy liable for the breaches of fiduciary duty described above both as a fiduciary and as a non-fiduciary who knowingly participated in prohibited transactions. They also move for summary judgment on their legal malpractice claim against McCarthy. Finally, they seek McCarthy's removal as counsel to the Employer Trustees pursuant to ERISA Section 409(a). 29 U.S.C. § 1109(a). I address each of the contentions in turn.

### A. Fiduciary Liability

Pursuant to ERISA,

a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(A). This definition of a fiduciary is functional and focuses on the nature of the duties performed rather than the title held by an individual. *Blatt v. Marshall and Lassman*, 812 F.2d 810, 812 (2d Cir.1987). It is well-settled by now that an attorney, performing his usual functions, cannot generally be a fiduciary under ERISA. *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259 (2d Cir.1987); 29 C.F.R. § 2509.75–5 (counsel to funds "performing their usual professional functions will ordinarily not be considered fiduciaries"). Nevertheless, attorneys who exercise discretionary authority over plan assets or administration of the plan may be fiduciaries under certain circumstances. *See id.* ("if the factual situation in a particular case falls within [the statute's definition] such persons would be considered fiduciaries"); *Mason Tenders Dist. Council Pension Fund v. Messera*, 958 F.Supp. 869, 881–82 (S.D.N.Y. 1997) (*Messera*) (attorney "involved in most or all aspects of the decision-making process" may be fiduciary); *Carpenters' Local Union No. 964 Pension Fund v. Silverman*, No. 93 Civ. 8787(RPP), 1995 WL 378539 (S.D.N.Y. June 26, 1995) (*Silverman*) (allegations that attorney defendants exercised control over funds states claim for fiduciary breach); *cf. Pedre Co., Inc. v. Robins*, 901 F.Supp. 660, 663–64 (S.D.N.Y.1995) (accountants can become fiduciaries). Thus, while "mere influence" does not transform one into a fiduciary, *see, e.g., Schloegel v. Boswell*, 994 F.2d 266, 271 (5th Cir.1993), in "some situations, an advisor's influence may be so great that it confers effective discretionary authority" and thus creates fiduciary liability. *Reich v. Lancaster*, 55 F.3d 1034, 1048 (5th Cir.1995) (*Lancaster*). In effect, this is plaintiffs' allegation here—that McCarthy exerted such influence over the trustees' decision making that he exercised effective control over the

---

**26.** To the extent that plaintiffs assert that the trustees failed to adequately consider diversification in making their investment decisions, they are entitled to summary judgment for the reasons discussed in Part I.C, *infra*. That is, to the extent that plaintiffs assert that the defendant trustees did not "(1) employ proper methods to investigate, evaluate and structure the investment; (2) act in a manner as would others who have a capacity and familiarity with such matters; and (3) exercise independent judgment when making investment decisions," *Lanka*, 810 F.Supp. at 387, and that such failures breached their general fiduciary obligations under ERISA Section 404(a)(1)(B), plaintiffs are entitled to summary judgment. That is, summary judgment is appropriate with respect to defendants' general duty of prudence and due diligence, but not with respect to the claims based on ERISA's specific diversification requirement. The statute "mandates a finding of fact that non-diversification was not clearly prudent before a finding of a fiduciary's liability [under Section 404(a)(1)(C)]. Without being able to asses the witnesses' credibility and on the record as it now stands, the Court cannot make such a finding." *King I*, 861 F.Supp. at 385.

Funds and is thus liable as a fiduciary. It is an allegation with a fair amount of support.

Plaintiffs' argument in this regard rests on McCarthy's failure to act as a prudent (or competent) Fund counsel by failing to advise the trustees as to their fiduciary duties, coupled with his innumerable conflicts of interest. As discussed in greater detail below with regard to McCarthy's possible malpractice liability, the record strongly supports the conclusion that McCarthy failed to advise the trustees as to their fiduciary obligations. Furthermore, this failure to advise did not occur in a vacuum, but in a context where the trustees' actions redounded to the benefit of McCarthy and those around him.

For example, plaintiffs have established that every major service provider to the Health Fund made payments to members of Bryan McCarthy's family through the family's "consulting" businesses, National Consultants Associated, Ltd. ("NCA") and Wynn Gert & Richter ("WGR").[27] These payments, if not made, would or should have reduced the premiums charged by these providers. McCarthy failed to disclose this information to the trustees,[28] see Pl. Rule 56.1 Stmnt. ¶ 25, nor did he advise them of their fiduciary obligations to investigate these service providers and obtain comparative bids from other providers. See Pl. Rule 56.1 Stmnt. ¶ 46.[29] Plaintiffs argue convincingly that "[b]y allowing his family to profit from arrangements with service providers to the Funds and by willfully failing to disclose these arrangements and/or advise the trustees of the need to exercise due diligence in the selection and retention of the service providers, Bryan McCarthy effectively exercised discretion and control over Fund assets and thereby

assumed the role and responsibilities of a fiduciary." Pl. Rule 56.1 Stmnt. ¶ 48. That is, McCarthy's silence, while otherwise perhaps not rising to the level of effective control over Fund assets, supports a finding of fiduciary status because of the underlying conflicts and improper motives involved.

The same is true of other aspects of McCarthy's silence. The trustees' actions with respect to the Travelers arrangement benefitted McCarthy because he was counsel to Locals 912 and 1019 and received fees from them. Both of these unaffiliated and independent Locals, it appears, were established with McCarthy's help if not at his behest, just to pay his counsel fees and to benefit Peter Zappasodi and Michael Kauffman, service providers to the Funds who were making payments to McCarthy's brothers. Similarly, McCarthy's failure to advise the trustees with respect to their duty to collect interest on delinquent contributions redounded to his family's benefit, as it is alleged that benefitting employers were also paying his brothers. See Pl. Rule 56.1 Stmnt. ¶¶ 61, 70; McCarthy Depo. at 41; Zaccherio Depo. at 26.

McCarthy's failures to advise the trustees as described above may be viewed as exercising effective control over the Funds. This is especially true when viewed in the light of allegations such as: "Defendant Trustees did not make a move without him," Pl. Reply. Mem. at 2, the deposition testimony of one trustee who stated that he followed McCarthy's advice "probably in most cases," *id.* (citing testimony of Stephen Zaccherio), and the head of one of the two locals involved in the Travelers scheme, who testified that

---

**27.** The record demonstrates that HA Claims Administrators, Inc., which provides annual physical, MRIs, CAT scans and home care services made monthly payments to WGR; D.D.S., Inc., which provides dental benefits to plan participants, made monthly payments to WGR; Multiplan, which provides hospital cost containment services to the Funds, made payments to NCA; Vision Screening, Inc., which provides optical services to Fund participants, made payments to NCA; and Metran Funding, Inc., a taxi medallion brokerage firm in which the Funds invested, had made payments to WGR in the past. *See* Pl. Rule 56.1 Stmnt. ¶ 17 and evidence cited therein.

**28.** Plaintiffs have submitted deposition testimony from four trustees stating they never heard of WGR. While McCarthy has denied that he never advised the trustees of these family businesses, he has submitted no evidence to support his position.

**29.** McCarthy argues that such payments do not constitute prohibited transactions because his siblings are not parties-in-interest under ERISA. 29 U.S.C. 1002(14). While technically true, this does not absolve McCarthy of responsibility for his ethical and professional lapses or render the situation acceptable by any standard of decency, fairness or equity.

"Bryan held our hand in everything." *Id.* at 3 (citing testimony of Randy Tucker).

McCarthy's conduct is clearly violative of his ethical obligations and supports plaintiffs' claim for equitable relief removing McCarthy from his role as counsel to the Employer Trustees. The Court concludes, however, that to grant summary judgment as to McCarthy's fiduciary status on this record would be inappropriate. Ultimately, the nature and extent of McCarthy's influence over the trustees' decision-making—and his status as a fiduciary—is a question of fact, turning in part on the assessment of witness credibility. *See Lopresti v. Terwilliger,* 126 F.3d 34, 39–40 (2d Cir.1997) (fiduciary status is mixed question of law and fact; defendant's role is factual inquiry); *Schloegel,* 994 F.2d at 271 (question whether professional transcended "ordinary functions" to become fiduciary "contemplate[s] a ... fact-intensive inquiry"); *Lancaster,* 55 F.3d at 1044 ("the issue of ERISA fiduciary status is a mixed question of fact and law;" factual component of inquiry relates to "whether a person exercised authority or control in managing plan assets"); *Pension Fund–Mid Jersey Trucking Indus.—Local 701 v. Omni Funding Group,* 731 F.Supp. 161, 168 (D.N.J.1990) (status as fiduciary is question of fact precluding summary judgment). The same is true with respect to the allegations that McCarthy's conflicting interests rendered his silence actionable. Such a conclusion—that by failing to advise the trustees, McCarthy was exercising effective control over the Funds—requires that inferences be drawn from the facts presented and is inappropriate on summary judgment.

Plaintiffs have presented compelling evidence of McCarthy's guiding role in the trustees' actions. Nevertheless, in an abundance of caution, and realizing that on such a motion the defendant is entitled to every possible permissible inference, I find that issues of fact exist sufficient to deny summary judgment with respect to plaintiffs' fiduciary claims against McCarthy. Plaintiffs will be afforded the opportunity at trial to demonstrate that McCarthy's "influence [was] so great that it confers effective discretionary authority" on him, and thus creates

fiduciary liability. *Lancaster,* 55 F.3d at 1048. At that time, when I will be able to judge the credibility of the witnesses and draw the appropriate inferences, I will be better able to make this determination.

McCarthy's motion for summary judgment on these claims against him is denied. Plaintiffs have asserted facts that would easily enable a finder of fact to determine that McCarthy exercised such influence over the trustees as to render him a fiduciary under ERISA, but it is a determination that must await the trial of this matter.

### B. Non-fiduciary Liability

The complaint does not contain a separate cause of action for non-fiduciary liability against McCarthy. Nevertheless, the parties have fully-briefed this point and the record demonstrates that discovery covered elements of this claim as well. Plaintiffs are hereby given leave to amend their complaint to assert such a cause of action if they are so inclined. In light of the parties' briefing of this issue, and in the interest of narrowing the issues for trial, the Court addresses McCarthy's liability as a non-fiduciary.

Any claims against McCarthy as a non-fiduciary can be brought pursuant to one of two theories. First, plaintiffs can seek to hold him liable for knowing participation in the fiduciary breaches of the trustees. Second, he can be held liable as a non-fiduciary for participating in prohibited transactions. Plaintiffs only address liability for prohibited transactions in their brief. I first address the applicable law and then the factual record with respect to each of the potential bases for liability.

#### 1. Fiduciary Breaches

The Supreme Court has specifically held that money damages are not available against non-fiduciaries who knowingly participate in a fiduciary's breach under ERISA. *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993). The Court did note, however, that equitable claims against such non-fiduciaries *may* be available. "Professional service providers such as [attorneys] ... (*assuming nonfiduciaries can be sued under § 502(a)(3)* ) may be

enjoined from participating in a fiduciary's breaches, compelled to make restitution, and subjected to other equitable decrees." *Id.* at 262 (emphasis added). The Court's "assumption" is a reference to dicta earlier in the *Mertens* opinion that questioned whether any cause of action against non-fiduciaries for participation in a fiduciary's breaches was authorized by ERISA § 502(a) (pursuant to which plaintiffs here proceed).

■ Prior to *Mertens,* the Second Circuit recognized a federal common law cause of action against non-fiduciaries who knowingly participate in a fiduciary's breach. *Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270 (2d Cir.1992). As McCarthy concedes, courts in this Circuit have continued to follow *Diduck* absent contrary authority from the Court of Appeals. "The Supreme Court ... expressly reserved decision on th[e] question" of whether nonfiduciaries can be held liable for knowing participation in a fiduciary's breaches and *Diduck* therefore "remains the law of this Circuit." *Gruby,* 838 F.Supp. at 834 & n. 15; *see also Silverman,* 1995 WL 378539 at *5, 7; *Crimi v. PAS Indus., Inc.,* No. 93 Civ. 6394(RPP), 1995 WL 272580 (S.D.N.Y. May 9, 1995); *DeLaurentis v. Job Shop Technical Servs., Inc.,* 912 F.Supp. 57, 62–64 (E.D.N.Y.1996). I adhere to these decisions and hold that plaintiffs may assert a claim against McCarthy as a non-fiduciary for his knowing participation in the trustees' breaches.

Pursuant to *Mertens,* however, plaintiffs are limited to equitable remedies such as restitution and injunctive relief. The cases discussing the post-*Mertens* viability of *Diduck* have not addressed the question of the scope of available remedies under the Circuit's "common law" cause of action, as opposed to the statutory claim at issue in *Mertens.* The Circuit has noted in passing, without citing or discussing the continued viability of *Diduck,* that "ERISA does not authorize suits for money damages against nonfiduciaries." *Mullins v. Pfizer, Inc.,* 23 F.3d 663, 666 (2d Cir.1994) (citing *Mertens* ). While *Mullins* referred to suits brought pursuant to ERISA, as opposed to the common law actions authorized by *Diduck, see De-Laurentis,* 912 F.Supp. at 62–64 (recognizing

distinction between statutory and common law causes of action), it is incongruous that greater remedies would be available pursuant to a judicially inferred cause of action than pursuant to a carefully crafted statute. Accordingly, in light of *Mertens* and *Mullins,* I must conclude that only equitable remedies are available against nonfiduciaries who knowingly participate in a fiduciary's breach. *See Gruby,* 838 F.Supp. at 835 (recognizing continued vitality of *Diduck* but holding claims for money damages barred by *Mertens* ). McCarthy's motion for summary judgment is therefore granted to the extent plaintiffs seek money damages from him for his knowing participation in the fiduciary breaches of others. The motion is denied in all other respects.

■ To prevail on their claims against McCarthy as a non-fiduciary for his knowing participation in a fiduciary's breach, plaintiffs must establish (1) that the fiduciaries (the trustees) breached their duties; (2) that McCarthy knowingly participated in the breaches and (3) damages. *Diduck,* 974 F.2d at 281–82. As discussed above, the fiduciaries' breaches have been established as a matter of law and the issue of damages has been reserved for trial. Plaintiffs' summary judgment motion therefore turns on the second of the three elements—McCarthy's knowing participation in the breaches.

■ Knowing participation "can be broken down into two elements, namely (1) knowledge of the primary violator's status as a fiduciary; and (2) knowledge that the primary's conduct contravenes a fiduciary duty." *Gruby,* 838 F.Supp. at 835; *see also Diduck,* 974 F.2d at 283. There is no contention that McCarthy was unaware of the trustees' status as fiduciaries and indeed any such suggestion would be ludicrous in light of McCarthy's role as counsel and the statute's definition of fiduciary. *See* 29 U.S.C. § 1002(21)(A); *see also* 29 U.S.C. § 1002(14)(A) (describing fiduciaries as including trustees).

■ McCarthy argues that he cannot be deemed to have known that the trustees' conduct contravened a fiduciary duty because "[n]one of the acts complained of were a clear

violation of black letter law ." McCarthy Mem. at 13. The Court not only disagrees with this characterization of the trustees' actions (indeed, as held above, their conduct constitutes a breach of fiduciary duty as a matter of law) but as well with McCarthy's premise that absent a "clear" violation of "black letter" law, knowledge of a breach can not be imputed. Were the Court to adopt such a standard, liability for knowing participation in a fiduciary's breach would be rendered nugatory in any case in which the facts at issue differed, however slightly, from those in a decided case. Such a standard would also fly in the face of the Court of Appeals' holding that constructive knowledge of a breach is sufficient for knowing participation liability. *Diduck,* 974 F.2d at 283. That is, the defendant will be held liable where he "knew or should have known" that the trustees' conduct constituted a breach. *Id.* (citing cases). As counsel to the funds, McCarthy clearly knew or should have known that the failure to collect delinquent contributions, the failure to implement an investment policy and guidelines for the investment of Fund assets, the failure to diversify Fund assets, the failure to retain investment advisers for the management of Fund assets, the failure to properly investigate Fund investments and the failure to monitor the Pension Fund's solvency all constituted breaches of the trustees' fiduciary duties.

Finally, plaintiffs must also establish that McCarthy sufficiently "participated" in these breaches.

> One participates in a fiduciary's breach if he or she affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables it to proceed. The third party need not profit from the breach and the assistance required is less than the 'substantial assistance' necessary to impose aider-abettor liability under the securities laws.

*Diduck,* 974 F.2d at 284 (citations omitted). The record before this Court amply demonstrates that as Funds counsel McCarthy failed to properly advise the trustees as to their duties to invest prudently, as required by their fiduciary obligations. McCarthy has admitted that he never advised the trustees

that they should consider the various risks of alternative investments, McCarthy Depo. at 256, or that they should monitor the performance of the investments, *id.* at 257. Similarly, the record shows that McCarthy never advised the trustees of their obligations to solicit and consider competitive bids from service providers other than those who were making payments to McCarthy's family as described above. Pl. Rule 56.1 Stmnt. ¶ 46. As noted above, McCarthy's conflicts of interest raise the inference that McCarthy's failure to advise was willful and part of his control over the Funds. Put another way, such a willful failure to advise may constitute knowing participation in a fiduciary's breach. Such a conclusion, however, requires the drawing of inferences in favor of plaintiffs and is improper on summary judgment. On this record, the Court is unwilling to hold as a matter of law that McCarthy's acts or omissions sufficiently contributed to the trustees' breaches so as to render him liable as a participating third party. Accordingly, plaintiffs' summary judgment motion on this claim is denied.

## 2. Prohibited Transactions

As noted above, McCarthy can also be held liable as a nonfiduciary for his participation in transactions prohibited by ERISA Section 406. 29 U.S.C. § 1106. Even those Courts of Appeals that have rejected claims against non-fiduciaries for knowing participation in a fiduciary's breaches have allowed claims against non-fiduciaries for their participation in prohibited transactions. *Reich v. Compton,* 57 F.3d 270, 285–87 (3d Cir.1995); *Reich v. Rowe,* 20 F.3d 25, 31 & n. 7 (1st Cir.1994); *see also Nieto v. Ecker,* 845 F.2d 868, 873–74 (9th Cir.1988). The reasoning behind the availability of such relief is that ERISA Section 502(a)(3), 29 U.S.C. § 1132(a)(3)(b), authorizes equitable relief to redress acts or practices that violate ERISA and therefore reaches non-fiduciaries who participate in such acts.

ERISA Section 406(a)(1) describes the following as prohibited transactions:

> (A) sale or exchange ... of any property between the plan and a party in interest;

(B) lending of money or other extension of credit between the plan and a party in interest;

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

[or]

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan.

29 U.S.C. § 1106(a)(1). "Parties in interest" include counsel and service providers. 29 U.S.C. § 1002(14)(A)-(B). Plaintiffs contend that the Travelers arrangement and the failure to collect delinquent contributions constitute prohibited transactions and that McCarthy's participation in these transactions renders him a liable participant.

### a. Travelers Arrangement

As discussed above, questions of fact exist as to whether the Travelers arrangement constituted a prohibited transaction under ERISA. *See supra* Part I.B.2. In order to narrow the issues for trial, however, the Court addresses McCarthy's role in the Travelers transaction. An examination of the record in this regard leads to the inexorable conclusion that McCarthy participated in the transaction, and can thus be held liable should it be determined that the transaction is in fact prohibited by Section 406. *See Reich v. Polera Bldg, Corp.*, No. 95 Civ. 3205(RPP), 1996 WL 67172 (S.D.N.Y. Feb.15, 1996) at *5 (relief available against non-fiduciaries who "participate" in prohibited transactions).[30] The uncontested record evidence supporting this conclusion includes the following: McCarthy suggested amending the Health Fund Trust Agreement to allow members of other locals to participate in the Local 966 Health Fund, Health Fund Mins. Oct. 4–5, 1990 at 4; McCarthy started Locals 912 and 1019, along with others, Tucker Depo. at 11; McCarthy prepared the start-up documents for these Locals, Tucker Depo. at 11, 16, 18, 20–21, 36–37, 39; Local 1019 operated out of McCarthy's law office initially, S. Sombrotto Depo. at 6, 29; McCarthy served as counsel for both unaffiliated Locals, McCarthy Depo. at 463–64, 733; McCarthy drafted the identical letters requesting that Local 912 and 1019 members be permitted to participate in the Local 966 Health Fund, Tucker Depo. at 25, 27–28, Pl. Exhs. T, W; McCarthy drafted the agreements between Locals 912 and 1019 and the brokers (AOS and NPA), McCarthy Depo. at 462; and McCarthy received payment from Locals 912 and 1019 for the legal services he rendered these Locals, presumably including his services in drafting the letters requesting that these Locals be allowed to participate in the Local 966 Health Fund. McCarthy Depo. at 463–64. In response to this overwhelming evidence of his participation in the numerous transactions that allowed Local 912 and 1019 members to participate in the Health Fund, McCarthy has only submitted a self-serving affidavit that does not contest the relevant facts cited above. Accordingly, the Court holds that McCarthy can be held liable as a non-fiduciary for participating in the transactions enabling the participation of Locals 912 and 1019 in the Health Fund should such a transaction be determined to constitute a prohibited transaction. As discussed in greater detail below, McCarthy's conduct in this regard, coupled with his failure to inform the trustees of his multiple representations, is also relevant to plaintiffs' equitable claims against McCarthy seeking his removal as counsel to the Employer Trustees.[31]

---

**30.** McCarthy's knowledge with respect to the prohibited nature of the transactions is irrelevant. "Congress made it a per se violation of ERISA to conduct such transactions because they inherently compromise the duty of trust that is imposed on a fiduciary. The transactions enumerated in § 406(a)(1) are per se violations of ERISA regardless of the motivations which initiated the transaction, the prudence of the transaction, or the absence of any harm resulting from the transaction." *Id.* at *2 (citation omitted).

**31.** There is no contradiction in the Court's finding, on the one hand, that questions of fact exist with respect to McCarthy's status as a fiduciary, and its finding on the other hand that no such questions of fact exist with respect to McCarthy's participation in the Travelers arrangement. First, a finding of fiduciary status requires a showing of "effective control" while participation requires just that—participation and not control. Second, much of the evidence relied on to establish McCarthy's participation in the Travelers arrangement relates to his role as counsel for Locals 912 and 1019, a role only indirectly

### b. Delinquent Contributions

■ As noted above, the trustees' failure to collect delinquent contributions from employers and their practice of regularly waiving the interest due thereon constituted both a fiduciary breach and a violation of ERISA's prohibited transactions provision. McCarthy's liability for these breaches depends on the extent of his involvement in them. While as Funds counsel McCarthy would have responsibility for instituting suits to collect delinquent contributions and interest, he could do so only if authorized by the trustees, assuming of course that the trustees, rather than McCarthy made such decisions. The record raises serious questions as to who in fact made such decisions—McCarthy or the trustees. The existence of such questions, however, precludes the entry of summary judgment on the claims against McCarthy relating to his participation in the prohibited transactions of waiving interest on delinquent contributions. Because of the serious nature of the allegations, and the substantial support in the record for plaintiffs' assertions, plaintiffs are given leave to amend their complaint, should they choose to do so, and to assert such a claim.

### C. Malpractice

■ Plaintiffs' eleventh cause of action states a claim for legal malpractice against McCarthy. McCarthy moves for summary judgment dismissing the claim and plaintiffs move for partial summary judgment on liability. It must first be noted that ERISA does not pre-empt state-law actions for legal malpractice. *Custer v. Sweeney*, 89 F.3d 1156, 1167 (4th Cir.1996) ("unanimous body of federal law" holds that ERISA does not preempt legal malpractice claims); *see also Messera*, 958 F.Supp. at 890 (recognizing legal malpractice ·claim by ERISA-covered funds against fund counsel). Moreover, contrary to McCarthy's assertion, supple-

mental jurisdiction is appropriate where, as here, the alleged acts giving rise to the malpractice claim are the same as those giving rise to the claim for breach of fiduciary duty under ERISA. *Lyon v. Whisman*, 45 F.3d 758, 761 (3d Cir.1995) (discussing *Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474 (3d Cir.1979)). As plaintiffs have stated a claim for legal malpractice (notwithstanding their failure to establish damages at this juncture), dismissal is inappropriate and McCarthy's motion is denied. *See Messera*, 958 F.Supp. at 890.[32]

■ In order to succeed on their malpractice claim, plaintiffs must establish that (1) an attorney-client relationship existed, (2) McCarthy failed to exercise the degree of care commonly exercised by an ordinary member of the legal community, (3) McCarthy's negligence was a proximate cause of plaintiffs' injury and (4) the plaintiffs incurred damages as a direct result of the negligence. *Steinfield v. Marks*, No. 96 Civ. 0552(PKL), 1997 WL 563340, at *4 (S.D.N.Y. Sept.8, 1997). The causation and damage elements include a "but for" requirement—that is, plaintiffs must demonstrate that "but for" McCarthy's negligent conduct, they would not have suffered the losses alleged. *Barry v. Liddle, O'Connor, Finkelstein & Robinson*, 98 F.3d 36, 39 (2d Cir.1996).

■ Plaintiffs have submitted evidence showing that McCarthy failed to advise the trustees of their fiduciary obligations to (i) consider the relative risk of investments, McCarthy Depo. at 256; (ii) use benchmarks to assess the performance of the Funds, McCarthy Depo. at 257; Smith Depo. at 132; (iii) get professional advice with respect to investments, Zaccherio Depo. at 113–14; (iv) monitor the commissions and fees charged by their broker, David Sigman, McCarthy Depo. at 243, 780–81; Zaccherio Depo. at 52–53; or (v) diversify the Funds' assets, Zaccherio

---

relevant to his fiduciary status vis a' vis the 966 Funds.

32. McCarthy's motion to dismiss the punitive damages claim against him is also denied. As he himself concedes, punitive damages are available where the attorney's conduct is "so outrageous as to evince a high degree of moral turpitude and showing such wanton dishonesty as to imply criminal indifference to civil obligations." *Walker v. Stroh*, 192 A.D.2d 775, 596 N.Y.S.2d 213, 214 (1993). The extent of McCarthy's culpability is a question of fact that must await trial. The ·record certainly establishes the possibility (if not the probability) that punitive damages are appropriate.

Depo. at 65–66, Smith Depo. at 135.[33] Plaintiffs have also submitted an affidavit from Mark Brossman, Esq., an ERISA attorney at the law firm of Chadbourne & Park. Mr. Brossman reviewed plaintiffs' Rule 56.1 statement and expressed his professional opinion that by failing to advise the trustees on these and other matters and by failing to disclose his various conflicts of interests, McCarthy's conduct fell below the knowledge, skill and diligence normally required of fund counsel. Brossman Aff. ¶¶ 19, 31, 40, 44.

McCarthy has submitted a self-serving affidavit, unsupported by any additional documentary evidence, denying some of the allegations described above. He has also submitted the affidavit of Franklin K. Moss, Esq., of Spivak, Lipton, Watanabe, Spivak & Moss. Mr. Moss is also an experienced ERISA attorney who asserts in his affidavit that "ERISA ... is conceivably the most arcane statute known to mankind," Moss. Aff. ¶ 6, and concludes that based on his review of the record McCarthy's conduct as Funds counsel "falls within the middle range" of ERISA attorneys. Id. ¶ 10.

The Court views the allegations against McCarthy—and the record submitted by plaintiffs' in support thereof—seriously. Moreover, the claim that the complexity of ERISA somehow relieves McCarthy of the obligation to perform his duties as fund counsel competently cannot seriously be entertained, for such a conclusion would eviscerate the duty owed by attorneys who represent ERISA-covered employee benefit funds.

Nevertheless, the Court concludes that summary judgment is inappropriate on the record before it. As noted above, a prima facie showing of legal malpractice requires a showing that defendant's conduct fell below the standard of care exercised by an ordinary member of the legal community. McCar-

thy's failure to advise the trustees with respect to their fiduciary obligations, coupled with his conflicts of interest and the resulting questionable motives, comes dangerously close to constituting a per se violation of this standard. However,

> [a] determination as to whether malpractice has been committed is generally a factual determination to be made by the jury. "Moreover, unless the ordinary experience of the fact-finder provides sufficient basis for judging the adequacy of the professional service or the attorney's conduct falls below any standard of due care, expert testimony will be necessary to establish that the attorney breached a standard of professional care and skill."

*Barry v. Liddle, O'Connor, Finkelstein & Robinson,* No. 93 Civ. 8707(CSH), 1997 WL 736725, at \*2(S.D.N.Y. Nov.25, 1997)(quoting *Greene v. Payne, Wood and Littlejohn,* 197 A.D.2d 664, 602 N.Y.S.2d 883, 885 (1993)); *see also Drab v. Baum,* 114 A.D.2d 992, 495 N.Y.S.2d 684, 685 (1985) ("factual findings are necessary to determine if defendant's conduct in this case 'fell below the ordinary and reasonable skill and knowledge commonly possessed by a member of his profession' "). Although plaintiffs have submitted an expert affidavit in support of their contention that McCarthy's conduct fell below the acceptable standard, summary judgment is inappropriate in light of the competing affidavit submitted by defendant and the limited nature of the material reviewed by Mr. Brossman. Accordingly, plaintiffs' motion for summary judgment on their malpractice claim is denied.[34]

### III. Vincent Sombrotto

Plaintiffs also seek to hold defendant Vincent Sombrotto, the former President of Local 966, liable for the fiduciary breaches dis-

---

33. Plaintiffs also make other allegations regarding McCarthy's failure to advise the trustees in their memo of law, but have failed to provide the Court with the deposition pages cited therein. *See* Pl. Mem. at 29 & n. 18.(citing McCarthy Depo. at 79, 262, 263, 267–69, 272).

34. The Court is also concerned that McCarthy not be held liable for failing to perform functions

usually performed by accountants or other investment professionals. Plaintiffs' allegations are properly limited to McCarthy's failure to advise the trustees with respect to their fiduciary obligations generally, as opposed to any failure to advise as to the financial soundness or prudence of particular investments.

cussed above.[35] Plaintiffs seek to hold Sombrotto liable as a fiduciary and as a non-fiduciary who participated in a fiduciary's breaches. Sombrotto moves for summary judgment on all the claims against him.

■ Before addressing the heart of the allegations against Sombrotto, several preliminary matters can be disposed of easily. First, as discussed above, Sombrotto's liability as a non-fiduciary is limited to equitable remedies. See supra Part II.B. As he is no longer serving as Local President, the only equitable relief available as to Sombrotto would be restitution. Second, as Sombrotto accurately points out, punitive damages are not available in an ERISA-based claim for breach of fiduciary duty, Diduck, 974 F.2d at 286, and plaintiffs' claim for such damages is hereby stricken. Third, in light of the extensive discussion below of the charges against Sombrotto, his motion for summary judgment is denied.

Plaintiffs' claims against Sombrotto can be grouped as follows. First, they seek to hold Sombrotto liable for the trustees' breaches of their fiduciary duties with respect to investments based on Sombrotto's power to appoint the Union Trustees. Second, plaintiffs seek to hold Sombrotto liable for his role in the Travelers arrangement, both as a fiduciary and as a non-fiduciary participant in a prohibited transaction. Third, they seek to hold Sombrotto liable as a fiduciary for his role in a failed attempt to invest in a letter of credit. Because I hold Sombrotto liable for the trustees' breaches by virtue of his power to appoint and remove trustees, I need not reach the second and third prongs of plaintiffs' argument.

Plaintiffs seek to hold Sombrotto liable for the trustees' breaches of fiduciary duty based on his power to appoint Union Trustees. The Trust Indenture gives Sombrotto, as Local president, the power to appoint Union Trustees. See Sombrotto Ex. 1 at 8, Art. III, § 1. It also gives him the power to remove Union Trustees from office. Id. at 9, Art. III, § 2 ("The Union Trustee [sic] may be removed from office at any time by the Union President."). Sombrotto admits that he appointed defendant Union Trustees Zaccherio and Gonzalez. Sombrotto Aff. ¶ 15. He claims such appointments were subject to the approval of the Union's executive Board, Sombrotto Reply Mem. at 3 n. 1, but the amendments to the Trust Indenture that provided for such approval were not approved until 1993.[36] Finally, Sombrotto admits that he attended most of the trustees' meetings and received a "full package of materials" at such meetings. Sombrotto Aff. ¶¶ 27–28. He cannot claim ignorance, therefore, as to the trustees' failure to meet their fiduciary obligations.

■ It is by now well-established that the power to appoint plan trustees confers fiduciary status. Tomasso, 682 F.Supp. at 1300, 1305 (Union is liable for trustees' fiduciary breaches where it had power to appoint and remove trustees); Hickman v. Tosco Corp., 840 F.2d 564, 566 (8th Cir.1988) (defendant corporation "is a fiduciary within the meaning of ERISA ... because it appoints and removes the members of the administrative committee that administers the pension plan"); 29 C.F.R. § 2509.75–8 at D–4 (employer's board of directors with power to select and retain plan fiduciaries is fiduciary); see also Licensed Div. Dist. No. 1 MEBA/NMU, AFL–CIO v. Defries, 943 F.2d 474, 477–78 (4th Cir.1991) (Defries) (power to appoint trustees confers standing to sue as fiduciary); Mobile, Alabama–Pensacola, Fla.

---

**35.** Although plaintiffs' motion papers purport to move for summary judgment on the first through eighth causes of action against Sombrotto, it is clear that they are in fact moving on counts I–VII and IX, the same counts discussed above.

**36.** It is not clear from the evidence before the Court when these amendments became effective. The Restated and Amended Trust Indenture for both the Pension and Health Funds, Sombrotto Exhs. 2–3, are both dated January 1, 1993. The Health Fund Minutes from December 15, 1993, however, resolve to "amend the Trust Indenture to provide that Union Trustees be appointed by a duly elected Executive Board of the Union," and direct defendant McCarthy to draft an appropriate amendment. Health Fund Mins. Dec. 15, 1993 at 5. The Court has not located any reference to amending the Trust Indenture in the Pension Fund minutes. In any event, as noted above, Sombrotto appointed Gonzalez and Zaccherio prior to the amendment of the Trust Indenture.

*Bldg. and Constr. Trades Council v. Daugherty,* 684 F.Supp. 270, 275 (S.D.Ala.1988) (same).

The extent of the concomitant fiduciary responsibility is less clear. Defendant argues correctly that fiduciary liability for "functional" (as opposed to named) fiduciaries extends only so far as the fiduciary has discretionary authority in the administration of a plan. *F.H. Krear,* 810 F.2d at 1259; *Cosgrove v. Circle K Corp.,* 884 F.Supp. 350, 353 n. 5 (D.Ariz.1995) (power to appoint trustees does not create fiduciary liability "for all purposes"); *cf. Defries,* 943 F.2d at 478 (standing to sue as fiduciary by virtue of power to appoint trustees extends only to suits pertaining to the appointment or replacement of trustees). That is, "the obligation as a fiduciary pertains only to the discretion thus created. So although [defendant] is a 'fiduciary', [his] obligation is only to use [his] limited discretion in the interest of the beneficiaries." *Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.,* 941 F.2d 561, 569 (7th Cir.1991).

■ The question is thus whether the limited power to appoint and remove trustees renders Sombrotto liable for the breaches those trustees committed. The answer is yes. The power to appoint and remove trustees carries with it the concomitant duty to monitor those trustees' performance. The "ongoing responsibilities of a fiduciary who has appointed trustees" requires that:

[a]t reasonable intervals the performance of trustees and other fiduciaries should be reviewed by the appointing fiduciary in such a manner as may be reasonably expected to ensure that their performance has been in compliance with the terms of the plan and statutory standards, and satisfies the needs of the plan.

29 C.F.R. 2509.75–8 at FR–17; *see also Leigh v. Engle,* 727 F.2d 113, 134–35 (7th Cir.1984) (appointment power includes duty to monitor appointees' actions); *Atwood v. Burlington Indus. Equity, Inc.,* No. 2:92CV00716, 1994 WL 698314 (M.D.N.C. Aug.3, 1994) at *13 (failure to monitor appointees leads to liability). The "limited" fiduciary obligations imposed on one who appoints trustees thus includes the obligation to ensure that the appointees are performing their fiduciary obligations.

■ The duty to monitor carries with it, of course, the duty to take action upon discovery that the appointed fiduciaries are not performing properly. "[B]y failing to take appropriate steps to remove Union-appointed trustees who it knew were breaching their fiduciary obligations to the Fund, defendant . . . failed to act solely in the interest of the Fund's participants and beneficiaries . . . in violation of ERISA §§ 404(a)(1)(A) and (B)." *Tomasso,* 682 F.Supp. at 1305; *see also Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 641 (W.D.Wis.1979)(failure to appoint new trustees constitutes breach of fiduciary duty); *cf. Weisler v. Metal Polishers Union & Metal Production & Novelty Workers Union 8A–28A,* 533 F.Supp. 209, 216 (S.D.N.Y.1982)(trustees have duty to rescind actions of prior trustees if they violated ERISA).[37] A failure to monitor appointees and to remove non-performing fiduciaries thus renders the appointing fiduciary jointly and severally liable for the appointed fiduciaries' breaches. *See Lowen v. Tower Asset Management, Inc.,* 829 F.2d 1209, 1220 (2d Cir.1987)(co-fiduciaries jointly and severally liable for fiduciary breaches); 29 U.S.C. § 1105(a). Sombrotto is thus liable for the trustees' breaches found above. The extent of damages, if any, will be determined at trial.[38]

---

**37.** This case law in effect reflects the statute's co-fiduciary liability provisions as applied to appointing fiduciaries. ERISA Section 405 provides that a fiduciary is responsible for his co-fiduciaries' breaches if (1) he knowingly participated in or concealed their breaches, (2) his own breach enabled the trustees to commit a breach or (3) he had knowledge of a breach by the trustees, unless he made reasonable efforts under the circumstances to remedy the breach. 29 U.S.C. § 1105(a). In this case, the failure to monitor and remove the breaching trustees satisfies both categories (2) and (3) above. *See also* 29 C.F.R. § 2509.75–8 at D–4, FR–16 (liability of one who appoints fiduciaries limited to selection and retention of fiduciaries *and* co-fiduciary liability under § 1105(a)).

**38.** In light of this holding, I need not reach plaintiffs' contentions that Sombrotto is liable as a fiduciary for his involvement in the Travelers arrangement and the trustees' search for a letter

## IV. Equitable Relief

### A. General Standards

Plaintiffs seek the removal of the current Employer Trustees, defendants Smith and Pasqualone, as well as the removal of defendant McCarthy from his role as counsel to the Employer Trustees. ERISA Section 409 provides that "[a]ny person who is a *fiduciary* with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries ... shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary." 29 U.S.C. § 1109(a). By its terms, section 409 applies only to fiduciaries. ERISA Section 502(a)(3), however, authorizes suits "to obtain other appropriate equitable relief" to redress violations of the statute. 29 U.S.C. § 1132(a)(3). As noted above, it is pursuant to Section 502(a)(3) that equitable relief can be obtained against non-fiduciaries who participate in either breaches of fiduciary duty or prohibited transactions. *See supra* Part II.B; *Nieto,* 845 F.2d at 873–74.

■ "Where there has been a breach of fiduciary duty, ERISA grants to the courts broad authority to fashion remedies for redressing the interests of participants and beneficiaries." *Donovan v. Mazzola,* 716 F.2d 1226, 1235 (9th Cir.1983); *see also Delgrosso v. Spang & Co.,* 769 F.2d 928, 937 (3d Cir.1985)("A federal court enforcing fiduciary obligations under ERISA is thus given broad equitable powers to implement its remedial decrees.").

■ The Second Circuit has held repeatedly that "removal of pension fund trustees and the appointment of a person to serve in their stead is appropriate under the statute when they have engaged in 'repeated or substantial violation[s] of [their] responsibilities.'" *Katsaros,* 744 F.2d at 281 (quoting *Marshall v. Snyder,* 572 F.2d 894, 901 (2d Cir.1978)). Other appropriate relief includes permanent injunctive relief prohibiting defendants from serving as fiduciaries or service providers to any ERISA plan, *see Beck*

*v. Levering,* 947 F.2d 639, 641–42 (2d Cir. 1991); *Lancaster,* 55 F.3d at 1054, and the appointment of a receiver or investment manager pending appointment or election of new trustees. *Bierwirth,* 680 F.2d at 276; *Donovan v. Bryans,* 566 F.Supp. 1258, 1264 (E.D.Pa.1983). Moreover, although injunctive relief is usually awarded after a full trial or evidentiary hearing, the Court of Appeals has made clear that "even in suits for injunctive relief, the district courts should not hesitate to grant a plaintiff's request for summary judgment when the defendant has failed to meet the requirements prescribed by Rule 56(e)." *Beck,* 947 F.2d at 642 (affirming permanent injunction prohibiting defendants from acting as fiduciaries to any ERISA plan granted on summary judgment).

■ Finally, injunctive relief is appropriate where the trustees' conduct has violated the prudence standards of Section 404, even if no losses have been established.

> If the [plaintiffs] can prove to a court that certain trustees have acted imprudently, even if there is no monetary loss as a result of the imprudence, then the interests of ERISA are furthered by entering appropriate injunctive relief such as removing the offending trustees from their positions.... In determining the appropriate injunctive relief, it is irrelevant that the honest but imprudent actions of the trustees resulted in no loss to the fund. Honest but imprudent trustees can dissipate the assets of a fund with speed comparable to dishonest trustees. In either case, imprudent trustees undermine the purpose of ERISA which is to insure that the assets of a fund will be there when the beneficiaries need them.

*Brock v. Robbins,* 830 F.2d 640, 647 (7th Cir.1987). The fact that plaintiffs have moved for partial summary judgment and have not established any losses to the funds does not, therefore, render injunctive relief improper.

---

of credit. Suffice it to say that, as noted above, the question of fiduciary status based on the extent of an individual's involvement in particu-

lar transactions is particularly fact-intensive and thus not appropriate for summary judgment. *See supra* Part II.A; *but see* note 17.

## B. Current Employer Trustees: Smith and Pasqualone

As the record discussed above demonstrates, the defendant trustees as a group completely failed to act with the prudence and skill required of them. Their failure to adopt any investment policy or guidelines, to investigate proposed investments, to apprise themselves of the commissions paid to their broker, to solicit and consider competitive bids from other service providers, to monitor the pension fund's solvency and take action to correct its growing problems all constituted breaches of their most basic obligations as fiduciaries. The current Employer Trustees are not responsible for all of the acts described above, as they began to serve only in December 1992 (Smith) and December 1993 (Pasqualone). Nevertheless, the nature of the failures is ongoing and much of it occurred on Smith and Pasqualone's watch. For instance, the investment subcommittee that approved Sigman's recommendations without any investigation existed until mid–1994. Similarly, the Travelers arrangement took place at the end of 1992 and the first half of 1993. Finally, Smith and Pasqualone have objected to proposals to hire investment managers and take other steps to rescue the Pension Fund from impending disaster. In light of the magnitude of the allegations of trustee failure and the ongoing nature of the conduct at issue, I find injunctive relief appropriate. Accordingly, defendants Smith and Pasqualone are hereby removed as trustees to the Funds pending the outcome of the litigation. In their place, I appoint Elliot G. Sagor, Esq., of Squadron, Ellenoff, Plesent & Sheinfeld, LLP, 551 Fifth Avenue, New York, New York, who will have all of the powers of the employer trustees, including two votes in trustee meetings, and who will serve until further order of this Court following the trial of this matter. *See Katsaros,* 744 F.2d at 281–82 (appointment of asset and fund manager does not violate Labor Management Relations Act ("LMRA") requirement that employees and employers be equally represented in administration of funds, because "these provisions of the LMRA are subject to the broad equitable powers granted by ERISA to remedy breaches of trust"). Mr. Sagor is authorized to retain Joseph P. Armao, Esq. as his counsel. With respect to compensation, any disputes will be resolved by the Court.

## C. Bryan McCarthy

Plaintiffs also seek the removal of McCarthy as counsel to the Employer Trustees. In light of my decision to remove the Employer Trustees, I believe this claim is now moot, as McCarthy's sole role is as counsel to the Employer Trustees and with their departure he should depart as well. Nevertheless, I briefly address this issue.

McCarthy's conflicts of interest are most troubling. They consist of McCarthy's representation of Locals 912 and 1019 in the Travelers arrangement, a representation that would inhibit McCarthy's rendering of honest and untainted advice with respect to the wisdom and propriety of allowing those unaffiliated Locals to participate in Local 966's Health Fund. They also consist of the fact that virtually every service provider to the Local 966 Health Fund was making payments to McCarthy's family for "consulting services" and that various 966 employers were represented by McCarthy's brother Randy. Although there is no evidence that McCarthy himself profited from the arrangements with the service providers or the employers, that is not required for entry of injunctive relief. McCarthy's conflicted loyalties are obvious—his obligation was to advise the Health Fund that competitive bidding and serious consideration of those competing bids for service providers was prudent and appropriate and he failed to do this. To put it more colloquially, McCarthy was involved in a kick-back scheme in which his brothers reaped the profits (at least initially), and after trial he may be enjoined from serving as counsel to the Employer Trustees.

## CONCLUSION

For the reasons discussed above, the defendants' motions for summary judgment are DENIED. Plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part. The Court holds that the trustees breached their fiduciary obligations to act prudently, pursuant to ERISA Section

**314**

404(a)(1)(B), with respect to counts one through seven and nine. The Court also holds that the failure to collect delinquent contributions (count one) constitutes a prohibited transaction. Summary judgment is denied with respect to plaintiffs' claims that the failure to diversify Fund investments violated the statutory requirements of ERISA Section 404(a)(1)(C). Summary judgment is denied with respect to the prohibited nature of the Travelers arrangement, as questions of fact exist with respect to whether the excess premiums constitute "plan assets" of Local 966. Summary judgment is denied on all claims against McCarthy, although the Court holds that he clearly participated in the Travelers arrangement. Plaintiffs are given leave to amend their complaint to assert claims against McCarthy for his non-fiduciary role in fiduciary breaches and prohibited transactions. Plaintiffs' motion for partial summary judgment is granted with respect to defendant Sombrotto, as the Court holds he is a fiduciary liable for the trustees' breaches pursuant to his power to appoint and remove Union Trustees. In light of the above findings the Court orders the removal of the current Employer Trustees, Stephen Smith and Joseph Pasqualone from their positions as Employer Trustees to the Local 966 Health and Pension Funds and enjoins them from serving the Funds or the Local in any capacity. The claims for money damages against all defendant trustees are dismissed, conditioned on final approval of the settlement agreement. This matter will be added to the March 1998 trailing trial calendar, with a joint pre-trial order due February 20, 1998.

**SO ORDERED.**